Filed 9/5/24  P. v. Stewart CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEVANTE TERRELL STEWART et al.,<br><br>    Defendants and Appellants. | E078408<br><br>(Super.Ct.No. RIF1803153)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge.

Affirmed in part, reversed in part, with directions.

Joshua L. Siegel, under appointment by the Court of appeal, for Defendant and Appellant Jevante Stewart.

Cliff Gardner, under appointment by the Court of appeal, for Defendant and Appellant Lonzo Lee Ford.

Ronda G. Norris, under appointment by the Court of appeal, for Defendant and Appellant Dameontae C. Wright-Patterson.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

In 2021, defendants and appellants Jevante Terrell Stewart, Lonzo Lee Ford, and Dameontae C. Wright-Patterson, were tried before the same jury and found guilty of the first degree murder of Curtis McDaniel. (Pen. Code, §§ 187, subd. (a), 189.[1]) The jury also found gang sentencing enhancement allegations (§ 186.22, subd. (b)) and gang-murder special circumstance allegations (§ 190.22, subd. (a)(22)) true against each defendant. The evidence showed that defendants drove to McDaniel's house on September 16, 2017, and shot and killed McDaniel in retaliation for a September 15, 2017 shooting at a member of defendants' gang by members of a rival gang associated with McDaniel's son.

Each defendant was also convicted of possessing a firearm as a felon at the time of the McDaniel shooting. (§ 29800, subd. (a); counts 2 [Stewart], 3 [Stewart] 4 [Wright-Patterson].) As to Ford, the jury found that a principal in the murder personally and intentionally discharged a firearm causing McDaniel's death. (§ 12022.53, subd. (e)(1).) As to Stewart and Wright-Patterson, the jury found the same firearm allegation not true. Based on the gang-murder special circumstance findings, each defendant was sentenced to life without the possibility of parole (LWOP) for the murder.

---

[1] Unspecified statutory references are to the Penal Code.

In this appeal, defendants raise multiple claims of error and join each other's contentions. We reverse the true findings on the gang enhancement allegations and gang-murder special circumstance findings, based on instructional error. Accordingly, we remand the matter to the trial court to allow the People the opportunity to retry these allegations, and for full resentencing, regardless of whether the allegations are retried or the results of any retrial. We affirm the judgments in all other respects.

## II.  BACKGROUND

A. *The McDaniel Shooting*

Around 4:00 p.m. on September 15, 2017, in the city of Hemet, Brandon Lawton, a high-ranking member of the Four Corner Hustler Crips ("4CHC") gang known as "Menace," was a passenger in his mother's car when another car pulled up and opened fire, striking the car four times. No suspects in the Lawton shooting were identified, but law enforcement officers and 4CHC gang members believed the shooter was a member of the NAW ("n . . . s always with it") gang, a rival gang of the 4CHC gang.

Around 9:30 p.m. on September 16, 2017, the day after the Lawton shooting, McDaniel and his partner C.S. were in their house (McDaniel's house) in the city of Perris with their 11-year-old daughter and a younger granddaughter. The house was in NAW gang territory. The couple's 21- or 22-year-old son was associated with the NAW gang and lived in the home before he was sentenced to prison in June 2017. The son's car was parked in the driveway. The front door of the house was open, but the screened security door was closed.

3

C.S. and the children were upstairs when C.S. heard gunshots. C.S. came downstairs and found McDaniel lying on the living room floor. McDaniel had been shot by a single .45-caliber bullet which lodged in the front right side of his neck. He died from the wound on September 21, after he was taken off life support.

On the street in front of McDaniel's house, officers found five semiautomatic cartridge casings, including one .45-caliber casing and four .380-caliber casings. There was a single bullet hole in the front security door and bullet strike marks on McDaniel's house and his son's car. Surveillance video footage from the house across the street showed two persons walking toward McDaniel's house immediately before McDaniel was shot, but the persons' races, ages, and other characteristics were not visible in the video.

K.P. and his daughter, T.P., lived "just around the corner" and two to four houses down the street from McDaniel's house. Moments after the shooting, K.P. arrived at McDaniel's house and tried to help C.S. stop McDaniel from bleeding by holding towels against McDaniel's wound. In front of McDaniel's house, K.P. and T.P. spoke with the first deputy who arrived at the scene of the McDaniel shooting, and they briefly described what they had seen.

B. *Ford is Found in Possession of the .380 Handgun Used in the McDaniel Shooting*

On September 20, 2017, four days after the McDaniel shooting, officers conducted a traffic stop of a Cadillac occupied by driver Devaughn M. and passengers Lawton and Ford. When the Cadillac stopped, Ford fled on foot from the rear passenger seat, but

Devaughn M. and Lawton stayed in the car. Ford was found hiding in the yard of a nearby residence and was detained without incident.

Eight to 10 feet from the Cadillac, in the area where Ford had fled, officers found a loaded Ruger LCP .380 firearm. Based on his possession of the .380 firearm on September 20, 2017, Ford pleaded guilty to active gang participation (§ 186.22, subd. (a)) and unlawful possession of a firearm (§ 29800, subd. (a)), and admitted he possessed the firearm for the benefit of a criminal street gang (former § 186.22, subd. (b).) In April 2018, ballistics tests were completed and showed that the .380-caliber firearm found in Ford's possession on September 20 was the firearm that shot the .380-caliber casings found at the scene of the September 16 McDaniel shooting.

C. *Defendants' Law Enforcement Contacts and 4CHC Gang Membership Admissions*

1. Contacts with Stewart

On January 3, 2017, during a traffic stop in San Jacinto, Stewart admitted he was a 4CHC gang member and his moniker was "Four Bang." During a traffic stop on September 21, Stewart again admitted he was a 4CHC member, but he said his moniker was "Taz." An officer testified that gang members may use multiple monikers or change their monikers over time.

At the time of the September 21, 2017 traffic stop, Stewart was a passenger in a beige Infiniti, and the driver, J.M., was a 4CHC member on active parole. The Infiniti was not registered to Stewart. Photos taken at the September 21 traffic stop showed the Infiniti, its license plate number, and Stewart with 4CHC gang tattoos.

5

On October 15 or 25, 2017, Stewart was stopped while driving a silver Infiniti (not the beige Infinity he was riding in on September 21, 2017) and, during this stop, Stewart again admitted he was a 4CHC member with the moniker "Taz." On October 2 and October 26, 2017, Stewart received traffic citations while driving the silver Infiniti. Records generated by a mobile license plate reader showed that, on May 25, 2017, the silver Infiniti was five or six houses away from McDaniel's house.

In an April 20, 2018 traffic stop, Stewart again admitted he was a 4CHC member with the moniker "Taz." Photos taken at the April 20 traffic stop showed Stewart had 4CHC gang tattoos.

2. Contacts with Wright-Patterson

On January 9, 2018, Wright-Patterson told a Hemet police officer he was a 4CHC member and his moniker was "Marlin Blue." That day, Wright-Patterson was taken to a hospital to be treated for injuries he sustained while resisting arrest. When interviewed, Wright-Patterson initially denied, but later admitted, having a gun in his possession at the time of his January 9 arrest. Wright-Patterson was arrested based on reports that a man matching his description was armed and "trying to get into cars." Wright-Patterson had no gang-related tattoos.

3. Contacts with Ford

Following a May 4, 2018 traffic stop, Ford was arrested and charged with two counts of attempted murder. Ford was found riding in a vehicle that matched the description of a vehicle used in a drive-by shooting earlier that day in which two persons were shot. Three other people were in the vehicle, and a firearm was found in the

6

vehicle. During a police interview, Ford admitted he was the shooter in the May 4 drive-by shooting; he knew he shot two people; he was trying to kill one of them because that person had disrespected the mother of his child; and he obtained the gun found in the car a few days earlier after he was released from jail. Ford also said he was a member of the 4CHC and his moniker was "Zo." Photos of Ford's neck and hands, showing his 4CHC gang tattoos, were admitted into evidence. The jury also heard that Ford was on probation in two other criminal cases at the time of his May 2018 arrest on two attempted murder charges.

D. *Defendants' Social Media Records*

During the investigation of the McDaniel shooting, officers obtained records from social media accounts associated with defendants and other 4CHC gang members. A social media post dated May 17, 2017 from Ford's social media account showed a photo of Ford holding a firearm and indicated that Ford's gang moniker was "BG Menace." An online message dated September 11, 2017 showed Ford told Lawton (Menace) that NAW gang members had been "ridin' around" in 4CHC territory, that Ford and Wright-Patterson would be in 4CHC territory, and that Ford wanted to obtain a firearm.

In a September 14, 2017 social media conversation, Ford asked a 4CHC associate to purchase a firearm for Ford, and the associate responded, "I got you," indicating she would do so. Shortly before midnight on September 15, Ford sent the same 4CHC associate an online message, saying NAW gang members had just shot at Lawton, and indicating it was necessary to retaliate for the Lawton shooting. Ford's September 15

7

message stated: "The noodles jus buss on Menace and his mom." "Noodles" was a derogatory term that 4CHC members used to describe NAW members as "soft."

On September 17, 2017, the day after the McDaniel shooting, Ford posted a photo of himself holding a "cup of noodles" soup. Comments on the post from other 4CHC members included, "Noodlekilla" and "Nawwkillaaa." In a post dated November 23, 2017, Ford said he had been shot in his hand, blamed the NAW gang, and said, " 'We killed him.' "

Stewart's social media records showed that, after the McDaniel shooting, Stewart identified himself as "Four Bang" and was in contact with Ford, Lawton, and other 4CHC members. In a photo posted on March 15, 2018, Stewart posed with a 4CHC member and both were displaying a 4CHC hand sign—four fingers with the thumb tucked in. Wright-Patterson's social media records showed he used gang terminology and communicated with Lawton in August 2017.

E. *The* Perkins[2] *Operations*

On September 22, 2017, Investigator Anthony Johnson, a homicide investigator with the Riverside County Sheriff's department and the lead investigator in the McDaniel shooting, became aware that Ford was arrested on September 21, 2017 in possession of a .380 firearm.[3] Although no suspects had yet been identified in the McDaniel shooting,

---

[2] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*). In a *Perkins* operation, an undercover Government agent, posing as a jail mate of a criminal suspect, seeks to obtain incriminating statements from the suspect. (See *Perkins* at pp. 297-298.)

[3] At the time of trial in December 2021, Investigator Johnson was a senior investigator with the Riverside County District Attorney's office.

Johnson suspected that the shooting was related to the rivalry between the 4CHC and NAW gangs. Thus, Johnson decided to submit any .45-caliber or .380-caliber firearm found in the possession of the rival gangs for analysis to determine whether they were used in the McDaniel shooting. In September 2017, Johnson submitted the .380 firearm found in Ford's possession for analysis to determine whether it was the gun used to fire the four .380 casings found at the scene of the McDaniel shooting.

On February 21, 2018, Investigator Johnson received information that three 4CHC gang members known as "Bee Gee, Marlin Blue, and Four Bang" were involved in the McDaniel shooting. Law enforcement officers from the Riverside County "gang impact team" advised Investigator Johnson that Ford was BG, Wright-Patterson was Marlin Blue, and Stewart was Four Bang. In April 2018, Johnson received the results of ballistics tests, which showed that the .380 firearm found in Ford's possession on September 20, 2017 was the gun used to fire the .380 caliber casings found at the scene of the September 16, 2017 McDaniel shooting.

In May 2018, Ford was in custody in Riverside County, Wright-Patterson was in Wasco State Prison, and Stewart's whereabouts were unknown. Investigator Johnson devised a plan to elicit statements from Ford and Wright-Patterson about the McDaniel shooting. In June 2018, Wright-Patterson was transferred from Wasco state prison to Riverside County.

On May 23 and June 27, 2018, Investigator Johnson and other officers conducted two undercover jail operations, or "*Perkins* operations," in an effort to elicit statements from Ford and Wright-Patterson about the McDaniel shooting In each operation, Ford

9

and Wright-Patterson were each placed in a monitored jail cell with an undercover agent dressed as a jail inmate.[4] The May 23 conversation between the agent and Ford, and the June 27 conversation between the agent and Wright-Patterson, were audio-recorded and played for the jury.

### 1. Ford's *Perkins* Statements

During the May 23, 2018 *Perkins* operation with Ford, the agent initiated a conversation with Ford while they were being held in the same jail cell, expecting to be transferred to other jails. In response to the agent's questions, Ford said he had just turned 20 years old; he was expecting the birth of his first child, a daughter; he was from the 4CHC gang; and his moniker was "BG Menace." The agent told Ford that the agent was 40 years old, he was a Crip from Long Beach, and he was still dealing with gang-related charges.

Ford told the agent that Ford was being charged with "two attempted murders," he had two strikes, and he was on probation in two different cases, "a felony gun case and then a felony gun case with [a] gang enhancement." Ford described the circumstances of his second strike offense: he said he had to "jump out of the car getting' pulled over"; he had a gun; and he threw the gun away but the police found it. Ford said his two attempted murder charges were for an earlier incident in which he shot at two people, and he was trying to get the attempted murder charges reduced to assault with a firearm.

---

[4] In their briefs on appeal, the parties indicate that Ford and Wright-Patterson each spoke with a different undercover agent. The record indicates, however, that the same agent, agent "109," spoke with Ford and Wright-Patterson.

At one point while Ford and the agent were speaking, Investigator Johnson came to the jail cell and said he would be returning in a while to speak to Ford about "a . . . shooting." After Johnson left the cell, the agent asked Ford whether any guns he had been "caught with" had been "used on anything." The agent told Ford that someone from or associated with Ford's gang must be telling law enforcement that Ford was involved in the shooting that Johnson was talking about, and the agent advised Ford to claim he did not know anything about how any of the guns found in his possession had been used.

Ford then told the agent about the McDaniel shooting. Ford first explained that people from his "hood" "knew" or assumed he would retaliate against the NAW gang after its members shot at his fellow 4CHC gang member's mother's car. Ford then told the agent that he and two others went to McDaniel's house because they knew McDaniel's son was a NAW gang member. Ford said he had a "Mack" gun and he gave a "380" to his fellow shooter, "Dameontae" (Wright-Patterson). Ford told the agent that McDaniel "walk[ed] up to the door" when Ford and Wright-Patterson were outside, "acting like" they were going to "knock on the door." Ford said he thought McDaniel was a NAW gang member because McDaniel had tattoos. Ford also thought that McDaniel had something in his hand. Ford then shot McDaniel through the front door, while "Four Bang" (Stewart) stayed in the car and "didn't see nothin' " but "knew what happened."

After the shooting, Ford gave the Mack gun to Wright-Patterson, who got rid of it the day after the shooting because it was the gun that killed McDaniel. Wright-Patterson returned the .380 firearm to Ford, and Ford kept the .380 firearm. The .380 firearm had a

11

laser on it, and when Ford "got caught" with it, he "took the strike" and the gang enhancement (he pleaded no contest or guilty to unlawful firearm possession and admitted a gang enhancement) because he thought the court would immediately order the .380 destroyed, and the .380 would not be linked to the McDaniel shooting. Ford said there were "shells everywhere" at the scene of the McDaniel shooting.

After Ford made these statements to the agent, Investigator Johnson removed Ford from the jail cell to interview him. In the interview, Ford said that photos of Stewart and Wright-Patterson "looked familiar" but denied knowing Stewart or Wright-Patterson. The jury also heard that, while in custody in county jail on October 30, 2018, Ford started a fight with a fellow inmate, a NAW gang member. Ford told an investigator he started the fight because the inmate was a NAW gang member, and the NAW gang was a rival of Ford's 4CHC gang.

2.  Wright-Patterson's *Perkins* Statements

During the second *Perkins* operation on June 27, 2018, Wright-Patterson told the agent he was 19 years old, he was a "known gang member," and he believed he had just been transferred to county jail from state prison because law enforcement suspected he knew something about an attempted murder that his "homie" had just "got caught for." The agent, who at one point said he was about to turn 42 years old, suggested that Wright-Patterson had been transferred because someone was implicating Wright-Patterson in a crime.

Investigator Johnson later came to the cell with another detective and told Wright-Patterson that they would soon be talking to him about a "September" 2017 shooting that

12

Wright-Patterson was "involved" in, and that Johnson *knew* "it was" Wright-Patterson, "Lonzo" (Ford), and "Jevante" (Stewart). After Johnson and the other officer left the jail cell, Wright-Patterson told the agent that Lonzo (Ford) was BG, that Jevante (Stewart) was "Fo' Bang," and explained how he, BG, and Four Bang were involved in the McDaniel shooting. Wright-Patterson said Four Bang "set it up" and drove the three of them to McDaniel's house because Four Bang knew the person who "ran" the NAW gang lived there. Wright-Patterson said he used a .380 gun, which Ford gave him; Ford used a "bigger" gun; and Ford shot and killed McDaniel. Wright-Patterson claimed he did not shoot at anyone or hit anything; he only shot "up in the air." He said Ford was a "hot head" who had two strikes and was facing an attempted murder charge for another shooting.

F. *Stewart's July 2018 Arrest and Subsequent Interview Statements*

Investigator Johnson did not conduct a *Perkins* operation with Stewart. On July 8, 2018, Stewart was arrested in Las Vegas at the home of older 4CHC gang member, Tremaine "T-Paper" Pritchett. Stewart was then transferred to Riverside County and interviewed by Investigator Johnson. In the interview, Stewart admitted he was a 4CHC gang member with multiple monikers including "Four Bang." When shown photos of Ford and Wright-Patterson, Stewart eventually admitted he knew Ford and Wright-Patterson but denied he was close with them, denied he was ever in a car with them, and denied ever owning an Infiniti.[5]

---

[5] In separate interviews with Johnson, when shown a photo of McDaniel, each defendant denied knowing McDaniel.

G. *T.P.'s Pretrial Statements and Trial Testimony*

    1. <u>T.P's Photo Lineup Identifications of Stewart and Other Pretrial Statements</u>

On July 12, 2018, Investigator Johnson met with T.P. at her home near the scene of the McDaniel shooting and showed her three six-pack photo lineups, each including photos of Ford, Wright-Patterson, and Stewart. From the first photo lineup, T.P. identified Stewart as one of the individuals she saw on the night of the McDaniel shooting, but T.P did not identify Ford or Wright-Patterson from the other photo lineups. After T.P. identified Stewart, T.P. told Johnson that, on the night of the shooting, Stewart had a "Kid 'n Play" haircut, a particularly "tall hairstyle." Stewart was the only person in the first photo lineup with a Kid 'n Play haircut. T.P. then showed Johnson a social media post dated April 28, 2018, which included a photo of Stewart with the Kid 'n Play haircut and another person named "Natalie."

T.P. then told Johnson that T.P. saw Stewart and Natalie, sometime after the shooting, when they came into the store where T.P. was working. T.P. told Johnson that Natalie used to live across the street from T.P. According to Johnson, T.P. did not previously tell Johnson about seeing Stewart and Natalie, although T.P. had met with Johnson two days after the shooting and on several other occasions. Later on July 12, Johnson showed T.P. a second photo lineup which included a photo of Stewart with a different hairstyle, Stewart's July 2018 Las Vegas booking photo. T.P. also identified Stewart from the second photo lineup.

14

2. T.P.'s Trial Testimony

T.P. testified she was "nervous" and "scared" to testify because she had recently received threats and believed her "life" was "on the line." Shortly before trial, Natalie sent T.P. an online "friend" request and social media text saying "you will get yours." In addition, sometime after the McDaniel shooting, Natalie posted a "fake page" calling T.P. a "NAW gang snitch" even though T.P. "never gang banged." T.P. was not friends with Natalie and did not communicate with her; T.P. knew Natalie as someone who used to live across the street from T.P., but T.P. and Natalie had never "hung out" or attended school together.

Regarding her reluctance to testify, T.P. said, "Let's just get over it, so Hog could get justice." T.P. explained that "Hog" was the nickname T.P. gave McDaniel; T.P. and McDaniel were "close"; he was "family" and had watched T.P. and her brothers grow up. Regarding the McDaniel shooting, T.P. testified she was alone in her upstairs bedroom when the sound of a speeding car caught her attention. T.P. looked out of her bedroom window, which was open and did not have screens, curtains, or blinds, and saw a gold or silver car with tinted windows pull up, stop, and park in front of McDaniel's house.[6] It was dark outside. T.P. saw three young men; one "had on a white jacket, no shirts, chains, white pants" and a "Kid 'n Play" haircut. This man's white jacket had a hoodie

---

[6] Investigator Johnson confirmed there was a "clear view" of McDaniel's house from T.P.'s upstairs 's window, and, according to Google Earth, T.P.'s house was 180 feet from McDaniel's house.

15

that was down, and T.P. could see his face. He got out of the driver's side of the car,[7] "kneeled," and fired a gun at McDaniel's house. As he knelt and fired the gun, his back was to T.P. T.P. confirmed that she identified the man in the white jacket as Stewart in the photo lineups that she was shown on July 12, 2018. T.P. had never seen Stewart before the shooting, but T.P. was "sure" Stewart was one of the three men she saw at the time of the shooting.

T.P. heard five gun shots. Stewart was the only man T.P. saw shooting a gun. T.P. did not see the other two men get out of the car or notice them until after she heard five gunshots. The other men were wearing black jackets, with the hoodies up, and dark blue pants. One of the two men wearing black hoodies "came out of nowhere" and was "hiding" between two houses. T.P. did not see this man "do anything." The second man in a black hoodie was standing near a pole across the street from McDaniel's house. This man was wearing black gloves, but T.P. did not see that he had a gun. After the shots were fired, the two men in black hoodies were running on the street in front of McDaniel's house. T.P. did not see Stewart or the two men in black hoodies get back into the car or see the car leave, but the car quickly sped away.

Immediately after the shooting, T.P. and her father K.P. ran from their house over to McDaniel's house. On September 17, 2017, the day after the shooting, Stewart and Natalie came into the store where T.P. worked. Natalie said "hi" to T.P.; Stewart looked

---

[7] T.P. was not asked whether the vehicle she saw stop and park in front of McDaniel's house had two doors or four, or whether she saw the man in the white jacket get out of the driver's door of the car.

at T.P. and did not say anything. Stewart was dressed in the same clothes he was wearing the night before: a white jacket and no shirt. T.P. did not see Stewart after that day. T.P. claimed she told Investigator Johnson about seeing Stewart and Natalie at the store when she met with Johnson two days after the shooting.

## H. *Investigator Dean Benjamin's Expert Gang Testimony*

Dean Benjamin, a senior investigator with the Riverside County District Attorney's Office, testified for the prosecution as an expert on criminal street gangs. In 2017, Benjamin was a Hemet police officer, assigned to the Riverside County "gang impact team", a regional task force comprised of officers from local, state, and federal law enforcement agencies. The gang impact team investigated gang-related crimes. As a member of the gang impact team, Benjamin assisted with the investigation of the McDaniel shooting. Benjamin was personally familiar with Ford, Wright-Patterson, and Stewart; at various times before the McDaniel shooting, Benjamin had spoken at length with each defendant and had arrested each defendant at least once. Benjamin opined that the 4CHC was a criminal street gang; that Ford, Wright-Patterson, and Stewart were active members of the 4CHC gang at the time of the McDaniel shooting; and that the McDaniel shooting benefited the 4CHC gang by protecting its livelihood.

Benjamin explained that the 4CHC was formed in Lake Elsinore around 1989. In 2017, the 4CHC had around 40 active members, and its territory included parts of Lake Elsinore and Hemet. Its common signs and symbols included the number "4," the colors green and dark blue, and a green four-leaf clover. Its members often wore gear from the Florida Marlins baseball team, which displayed the letter "F," and the gang also used the

17

letter "F" with a the "stars and straps" clothing line motif. 4CHC members identified their gang affiliation by holding up four fingers and tucking their thumb (a gang sign) and having the number "4" tattooed on their faces.

The 4CHC's primary activities included burglaries, burglaries for firearms, drug sales, and firearm possessions and use. These crimes benefited the gang by producing money or firearms for the gang. Stealing and possessing firearms benefited the gang by allowing its members to trade firearms within the gang, which in turn allowed the gang to use the firearms to commit crimes, retaliate against rival gangs, and defend themselves, their territory, and their monetary interests from rival gangs.

Older 4CHC members were called "OGs" or "big homies," and in the gang's culture younger members were required to do what a big homie told them. 4CHC members also had to "prove" themselves by " 'putting in work' " to earn the right to wear 4CHC tattoos. Members could put in work by doing a variety of things that benefited the gang, including committing crimes, assaulting rival gang members, and holding firearms for fellow gang members. Having a facial 4CHC tattoo indicated the member had "put in a significant amount" of work for the gang.

The 4CHC had several groups or cliques, known as "sets" or "chapters," including one called "Murder Mafia" which had "a large presence" in Hemet. It was common for members of a 4CHC set to commit crimes together. The NAW gang was one the 4CHC's primary rivals. There had been "a lot of back and forth violence" between the two gangs, including "shootings at various parties."

18

During Benjamin's testimony, the prosecution played edited versions of two gang-related "gangster rap" music videos, titled *Warning* and *Beefin'*, showing Ford and Wright-Patterson, respectively, with the rap artist Pritchett and other 4CHC gang members. In the videos, Pritchett and other 4CHC members make references to the 4CHC gang, "pimping," and shootings. The *Warning* video included lyrics indicating that a person's house would be "smacked," meaning "shot up," if the person "snitched" on the gang.

Ford appeared briefly in the *Warning* video, and Wright-Patterson appeared in the *Beefin'* video. In the *Warning* video, an unidentified male who appears to be Ford is briefly shown holding a firearm with a laser. In the *Beefin'* video, Wright-Patterson is shown giving a 4CHC hand sign.

Benjamin opined opinion that Ford was an active 4CHC member at the time of the McDaniel shooting based on Ford's social media posts, participation in the *Warning* video, conviction for possessing the .380 firearm used in the McDaniel shooting, *Perkins* statements, frequent presence in 4CHC territory, wearing 4CHC colors and associating with 4CHC members, admissions of being a 4CHC member, and 4CHC tattoos including a "4" on his face. Benjamin opined that Stewart was an active 4CHC member at the time of the McDaniel shooting based on Stewart's social media posts, presence in 4CHC territory with 4CHC members, and 4CHC tattoos, including "4CHC" on his abdomen, and "4" and "C" on his arms. Benjamin opined that Wright-Patterson was an active 4CHC member at the time of the McDaniel shooting based on Wright-Patterson's admission of being a 4CHC member, participation in the *Beefin'* video, history with the

19

4CHC, knowledge of the gang's activities, possession of the .380 handgun Ford gave him, and statements to law enforcement about the 4CHC and its key members.

Benjamin also opined that McDaniel was murdered for the "common benefit" of the 4CHC and the McDaniel shooting was in retaliation for the Lawton shooting. The 4CHC gang would have been seek as week if it had not retaliated for the Lawton shooting. This would have encouraged rival gang members to assault 4CHC members, encroach on 4CHC territory by selling narcotics there, thereby taking money from the 4CHC. Thus, Benjamin opined that the retaliatory McDaniel shooting protected 4CHC's livelihood.

I. *Prior Felony Stipulations*

For purposes of the unlawful firearm possession charges in counts 2, 3, and 4, the parties stipulated that each defendant was convicted of an unspecified felony before September 16, 2017, the date the information alleged each defendant unlawfully possessed a firearm.

J. *Defense Evidence*

1. Stewart's Attempts to Discredit T.P.

In his defense, Stewart presented body-worn camera footage from the deputy who spoke with K.P. and T.P. in front of McDaniel's house after the McDaniel shooting. In the footage, K.P. said he was walking down the stairs in his house when he heard gunshots; he went outside and saw one person: a male with a white jacket, and the male was running. K.P. did not see a gun and indicated that T.P. saw the shooting from her

20

window.  T.P. then told the deputy, "one had . . . a white shirt, and the other one had a black sweater and he had like a hoodie on and he started shooting."

Next, T.P. explained that, from her upstairs window, she saw "a guy with a white shirt and he bent down, and then another one had a black shirt, but he had his hoodie up and he went closer [as T.P. motioned toward McDaniel's house] and [inaudible] boom, boom, boom, boom, boom, five times and that was it, and I just told my dad [(K.P.)] hey dad you need to go over there."  K.P. and T.P. said the two men were around 18 to 20 years old, both were Black, and neither K.P. nor T.P. saw either man get into a car.

Later that evening, T.P. told another deputy that T.P. heard one gunshot followed by a pause of about one second, then four more "rapid" gunshots.  T.P. said she *then* looked out of her window and saw a thin Black male, around five feet eight inches tall, with light-colored dreadlocks, running toward McDaniel's house.  T.P. did not say she saw this man with a gun or shooting a gun.  T.P. also did not mention seeing a vehicle or a person with a "high-top fade hairstyle."

Next, Stewart called Investigator Johnson to testify about T.P.'s interview statements to Johnson.  Again, Johnson said he first interviewed T.P. two or three days after the McDaniel shooting.  In this interview, T.P. did not describe seeing someone with a high-top fade haircut.  T.P. described two shooters; she did not see a third shooter.  She said she saw someone whose hoodie was up get out of a vehicle.  She also said she saw someone kneeling in the street, pointing what appeared to be a gun toward McDaniel's house; seconds later, a Black male, wearing black, appeared to the kneeling person's left, then the Black male and the kneeling person fired four to five shots at McDaniel's house.

21

T.P. also did not tell Johnson she saw Stewart at the store where she worked the day after the shooting; she first disclosed that information to Johnson on July 12, 2018, after she identified Stewart in the first photo lineup. When Johnson asked T.P. why she did not previously tell Johnson about seeing Stewart at the store, T.P. indicated she was not asked the question and she was not going to "volunteer" information.

After T.P. identified Stewart in the first photo lineup, T.P. told Johnson for the first time that Stewart was the person she saw get out of a car wearing a hoodie, with the hood partially on or up. T.P. said she recognized Stewart's "Kid 'n Play" fade hairstyle and "protruding" ears, but T.P. had never seen Stewart before the night of the shooting. T.P. also told Johnson, for the first time on July 12, 2018, that the shooters arrived in a silver-colored sedan.

In February 2019, Johnson went to T.P.'s house to take photos from the vantage point of her bedroom window, and there were curtains on the window. T.P. told Johnson her curtains were closed at the time of the shooting, but a breeze was coming through, which allowed her to see outside, while people on the street could not see her because the curtains were closed as she was looking out.

Shortly before trial in December 2021, T.P. told Johnson for the first time that her family's house near McDaniel's house, where she and her family still lived, was "shot [at]" in May 2020. T.P. did not report the May 2020 incident to police or to Johnson when it happened, and she was not interviewed in the investigation of the incident. When Johnson discovered the incident in 2021 and asked T.P. about it, T.P. said she believed she was the target in the incident. The police report of the incident indicated, however,

22

that another house was shot at and did not mention T.P.'s house. Johnson reviewed the surveillance video taken from a house across the street from McDaniel's house, showing two people walking "separately" toward McDaniel's house immediately before the shooting. Johnson confirmed that video was not clear enough to identify the ages, races, or hairstyles of the two people.

2. Defendants' Recorded Holding Cell Conversations

Stewart's counsel also questioned Investigator Johnson about two audio-recorded conversations—one between Ford and Wright-Patterson, followed by one between Wright-Patterson and Stewart—that occurred on September 7, 2018 when defendants were in a courthouse holding area or "sally port," awaiting arraignment on the charges in this case (the "holding cell recordings"). Johnson arranged to record defendants' holding area conversations to obtain further statements from defendants about the McDaniel shooting. Stewart played both holding cell recordings for the jury.

In the holding cell conversation between Stewart and Ford, Stewart denied he was involved in McDaniel's murder and asked Ford to clear his name. Ford said he could not tell law enforcement that Stewart was not at the scene without placing himself at the scene and implicating himself in the McDaniel shooting. But Ford said he would claim he knew he had been talking to an undercover agent in jail, he lied to the agent to "fit in," and he "threw some names in there, people who . . . had nothing to do with it." Thus, Ford agreed he would try to clear Stewart's name. Deputies then took Ford out of the holding area.

23

Shortly after Ford was taken out of the holding area, Wright-Patterson, who was in protective custody in a holding cell adjacent to the cell where Ford and Stewart were conversing, began talking to Stewart. Wright-Patterson said he had been offered a deal to testify against Ford and Stewart, but he was not going to testify, and he was not a "snitch." Stewart told Wright-Patterson he had "read the discovery" and knew that Ford and Wright-Patterson had been recorded "on audio." Wright-Patterson then told Stewart that he had lied to the agent. Wright-Patterson explained that Ford was in custody for two attempted murders before Wright-Patterson was transported to Riverside County to talk to the agent; a "homie" was telling Wright-Patterson that Ford was snitching; some "bitches," including Natalie, knew too much; and, before Wright-Patterson talked to the agent, law enforcement officers told Wright-Patterson they knew that Ford, Wright-Patterson, and Stewart were involved in the McDaniel shooting. Wright-Patterson told Stewart, "we both know we didn't do nothing," but he also said he "told [his] cellie [(the agent)] a little bit too much." In their holding cell conversation, Wright-Patterson and Stewart agreed they would clear each other's names of any involvement in the McDaniel shooting.

K. *Closing Arguments*

In closing argument, the prosecutor told the jury: "[I]nstead of using my own words and telling you what happened, my version, I'm going to let Marlin Blue [Wright-Patterson] take it over from here. I'm going to read you from a snapsnot of the [*Perkins*] statement you heard. Let me read his words to you. [¶] 'Foe Bang drove there. Talking about this the house right here. Bee Gee, like, I don't want to use it. I don't want to use

24

the .380 because the .380 only got four bullets.  So I'm like, aw, so I took that baby .380 all this shit.  We pull up, hop out, and walk over there.  I'm trying to pull the trigger, but my gun didn't have one up top.  By the time I even thought about getting off the shot, Bee Gee had already killed the [n] from Hoover.  [¶]  Shit, me but Foe Bang—Foe Bang is the one who turned on that street.  He the one who planned it.  This is what we did. We went with Foe Bang, go to [the street in front of McDaniel's house].  The only reason why we went, the only reason why we went with Foe Bang is because he said he knew the [n] from NAW gang where he lived at.  That's the only reason why we went.  Foe Bang said the man who run [the street in front of McDaniel's house] live right here at this house.  He done been over there.  He done seen the [n].  All this shit, you feel me.  The only reason why we went, Foe Bang.  The reason Foe Bang set everything up.' "

Counsel for Stewart argued that the evidence against Stewart, namely, Ford's and Wright-Patterson's *Perkins* statements about Stewart's role in the shooting, and T.P.'s photo lineup identifications of Stewart and testimony that Stewart was the person she saw shooting at McDaniel's house, was unreliable.  Counsel for Stewart noted that, in the holding cell recordings, Ford and Wright-Patterson each admitted they lied when they told the agent that Stewart was the driver and the murder was Stewart's idea.  Counsel also argued that T.P.'s photo identifications and testimony identifying Stewart as the shooter were inconsistent with T.P.'s statements to officers on the night of the McDaniel shooting.

Counsel for Ford argued the jury should not trust Ford's *Perkins* statements because the agent was "just leading" Ford "step by step" to make the statements, and

25

Ford was only agreeing with and trying to impress the agent because Ford thought the agent was a "big homie" from Long Beach. Counsel also argued that no physical evidence linked Ford to the McDaniel shooting, and no evidence showed Ford possessed the .380 firearm that was found outside the vehicle Ford fled from in the September 20, 2017 traffic stop. Thus, counsel argued there was not enough evidence to prove beyond a reasonable doubt that Ford was involved in the McDaniel murder.

Counsel for Wright-Patterson similarly argued that there was no reliable evidence or proof beyond a reasonable doubt that Wright-Patterson was involved in the McDaniel shooting. Counsel noted that no "eyewitness" identified Wright-Patterson as present at the shooting and no evidence connected Wright-Patterson to "a gun or any physical evidence." Counsel argued the jury could not use Wright-Patterson's *Perkins* statements to convict him because no evidence corroborated the statements.

Counsel for Wright-Patterson also criticized the *Perkins* operations as unjust. Counsel said that, "by design," Wright-Patterson was placed alone, in a concrete jail cell, for a day, with no phone, no communications, and peanut butter sandwiches in an effort to "break him down" so he would speak to "the first person" who came in "that's a father figure, an older Black man." The agent was intended to "make these young men feel as comfortable possible," in part by "speaking the same language that they speak." Counsel also criticized the agent's gratuitous use of the "n-word" with Ford and Wright-Patterson, arguing "the cultural existence of these young men was weaponized by the district

26

attorney's office by way of their *Perkins* operators."[8]  Lastly, counsel criticized the

prosecution's use of the *Warning* and *Beefin'* videos, arguing the People wanted the jury

to "use" Wright-Patterson's "participation in a rap music video to wrongfully convict him

of murder."  In sum, counsel argued the prosecution did not prove the charges and

allegations against Wright-Patterson beyond a reasonable doubt.

### III.  DISCUSSION

A.  *The* Perkins *Statements Were Properly Admitted Against Each Defendant*

1.  Defendants' Claims Regarding the *Perkins* Statements

Stewart claims the trial court prejudicially erred in admitting Ford's and Wright-

Patterson's respective *Perkins* statements to the undercover agent during the May 23 and

June 27, 2028 *Perkins* operations.  Stewart claims (1) the *Perkins* statements were

testimonial, thus their admission violated Stewart's confrontation rights, (2) the *Perkins*

statements were inadmissible under state law because they were hearsay and did not

qualify under the statements against interest exception to the hearsay rule (Evid . Code,

§ 1230), and (3) the Perkins statements violated defendants' due process rights because

their admission rendered the joint trial fundamentally unfair.  Ford and Wright-Patterson

join Stewart's claims, but they do not challenge the admission of their own *Perkins*

statements against themselves. As the parties agree, Ford's and Wright-Patterson's

---

[8] The court sustained the People's objections to counsel's claims that "there were no rules of conduct for the police" in the *Perkins* operations and that the district attorney's office was "not accountable" for the operations, as misstatements of the law. The court repeatedly admonished the jury that the attorneys' closing arguments were not evidence.

respective *Perkins* statements implicating themselves in the McDaniel shooting were admissible against themselves under the hearsay exception for party admissions. (Evid. Code, § 1220.)

Ford claims that Wright-Patterson's *Perkins* statements implicating Ford as the person who shot and killed McDaniel were inadmissible against Ford as statements against Wright-Patterson's penal interests. (Evid. Code, § 1230.) Ford also claims Wright-Patterson's *Perkins* statements were testimonial; thus, their admission violated Ford's confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). Likewise, Wright-Patterson claims that Ford's *Perkins* statements implicating Wright-Patterson in the McDaniel shooting were inadmissible as statements against Ford's interests (Evid. Code, § 1230), and were testimonial and thus violated Wright-Patterson's confrontation rights under *Crawford* and *Bruton*. Ford and Wright-Patterson also join Stewart's due process claim.

2. Trial Court Proceedings

The prosecution filed a motion in limine to admit Ford's and Wright-Patterson's *Perkins* statements against each defendant, arguing (1) the statements were not testimonial; thus, their admission would not violate the confrontation clause, and (2) the statements were admissible despite their hearsay character because they qualified under the hearsay exception for declarations against interest. (Evid. Code, § 1230.) Stewart filed a motion in limine to (1) exclude the *Perkins* statements on hearsay and confrontation grounds, or (2) empanel a separate jury for Stewart so that Stewart's jury

would not hear the *Perkins* statements.  At the hearing on the motions, Stewart argued the *Perkins* statements were testimonial because they were made in response to the "functional equivalent" of a police interrogation targeting young Black males; thus, their admission would violate Stewart's confrontation, due process, and equal protection rights.  Stewart also argued the *Perkins* statements did not qualify as statements against Ford's and Wright-Patterson's interests because the statements were not specifically disserving to those interests and were untrustworthy.

Stewart specifically argued the *Perkins* statements were untrustworthy because Ford and Wright-Patterson each had an incentive to fabricate their roles in the shooting in order to impress the agent whom they believed was an older gang member.  Stewart also argued that Ford's and Wright-Patterson's holding cell statements, that they had lied to the agent about Stewart's and their own involvement in the McDaniel shooting, undermined the trustworthiness of their earlier *Perkins* statements to the agent.  Ford and Wright-Patterson joined Stewart's motion.

Relying in part on *People v. Almeda* (2018) 19 Cal.App.5th 346 (*Almeda*), the trial court ruled that (1) Ford's and Wright-Patterson's *Perkins* statements were not testimonial; thus, their admission would not violate any defendant's confrontation rights, and (2) the *Perkins* statements were admissible as statements against Ford's and Wright-Patterson's interests.  (Evid. Code, § 1230.)  The court also granted Stewart's motion to admit the holding cell recordings, including Ford's and Wright-Patterson's holding cell statements that they lied to the agent about Stewart's involvement in the McDaniel shooting.  Stewart argued, and the court and parties agreed, that the holding cell

29

recordings were admissible to impeach Ford's and Wright-Patterson's *Perkins* statements. (Evid. Code, § 1202.) In instructing the jury, the trial court did not limit the use of the *Perkins* statements or the holding-cell recordings to any defendant. In closing argument, the prosecutor argued "the most important testimony" the jury heard was "the words of these three men." The prosecutor said, "You don't have to rely on anything else. That alone, . . . leads you to the conclusion that these three men are guilty of first-degree murder and every single allegation that they have charged against them."

3. Wright-Patterson Has Preserved His Challenges to Ford's *Perkins* Statements

The People argue, "Wright-Patterson's attempt to join Stewart's claim should be deemed forfeited" because Wright-Patterson only objected to the prosecutor's use of the *Perkins* statements on the ground the prosecution conducted the *Perkins* operations in a racially-biased manner. (*People v. Seijas* (2005) 36 Cal.4th 291, 302 [The failure to timely and specifically object in the trial court on a ground raised on appeal forfeits the claim.]; Evid. Code, § 353.) We disagree. There was no forfeiture.

" '[A]n objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide' " and, " '[i]n a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented.' [Citations.] In addition, if the trial court considered and ruled on the issue as if an objection had been properly made, appellate review is permitted." (*People v. Frank* (1985) 38 Cal.3d 711, 737-738.) These conditions are met here.

As noted, Wright-Patterson joined Stewart's motion *in limine* to exclude Ford's and Wright-Patterson's *Perkins* statements in its entirety, merely emphasizing that the

30

*Perkins* statements would violate Wright-Patterson's rights of "equal protection and due process" because the *Perkins* operations "targeted" young Black men. The court ruled the *Perkins* statements were admissible against each defendant because the statements were not testimonial and qualified as statements against Ford's and Wright-Patterson's interests. Thus, the court ruled on Stewart's motion as if Wright-Patterson had joined it the motion in its entirety, and Wright-Patterson has not forfeited his challenges to the admissibility of Ford's *Perkins* statements against Wright-Patterson. Alternatively, we exercise our discretion to consider Wright-Patterson's challenges to Ford's *Perkins* statements, given that the claims concern Wright-Patterson's substantial rights. (*People v. Siejas*, *supra*, 36 Cal.4th at p. 302; § 1259.)

    4. The *Perkins* Statements Were Not Testimonial

        (a) *There Is No* Crawford *Error*

"[T]he Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses." (*People v. Lopez* (2012) 55 Cal.4th 569, 576.) *Crawford* held that the admission of "testimonial" hearsay violates a criminal defendant's Sixth Amendment confrontation rights unless (1) the declarant is unavailable to testify, and (2) the defendant had a prior opportunity to for cross-examination or waived that right by the defendant's own wrongdoing. (*People v. Leon* (2015) 61 Cal.4th 569, 602-603; *Crawford*, *supra*, 541 U.S. at p. 68.) "[T]he confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by a witness at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

31

"Although *Crawford* and its progeny have 'not settled on a clear definition of what makes a statement testimonial, [our state Supreme Court has] discerned two requirements. First, "the out-of-court statement must have been made with some degree of formality or solemnity." [Citation.] Second, the primary purpose of the statement must "pertain[] in some fashion to a criminal prosecution." ' " (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 66 (*Gallardo*), quoting *People v. Leon*, *supra*, 61 Cal.4th at p. 603.) "Thus, 'the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. . . . [T]he primary purpose for which a statement was given and taken is to be determined "objectively," considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.' " (*Gallardo*, at p. 66, quoting *People v. Cage*, *supra*, 40 Cal.4th at p. 984, fns. omitted.)

Defendants argue that Ford's and Wright-Patterson's *Perkins* (hearsay) statements were testimonial because the agent's " 'primary purpose' " in obtaining the statements was to use them in a criminal prosecution for the McDaniel shooting. That is, defendants claim the *Perkins* statements were testimonial because they were made in response to the "functional equivalent" of a police interrogation. But, as numerous courts have recognized, statements made *unwittingly* to a government informant are nontestimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 825 (*Davis*) [nontestimonial statements include "statements made unwittingly to a Government informant" and "statements from one prisoner to another"]; *People v. Tran* (2022) 13 Cal.5th 1169, 1197 (*Tran*); *Almeda*,

*supra*, 19 Cal.App.5th at p. 362; *Gallardo*, *supra*, 18 Cal.App.5th at p. 67; *People v. Arauz* (2012) 210 Cal.App.4th 1393, 1402.)

Here, the trial court reasonably concluded that Ford's and Wright-Patterson's *Perkins* statements were not testimonial because the statements were unwittingly made to the undercover agent. The entire content of Ford's and Wright-Patterson's conversations with the agent shows that, when Ford and Wright-Patterson spoke to the agent, they believed the agent was an older gang member and fellow inmate, not a government informant. Thus, none of the *Perkins* statements were testimonial, and their admission did not violate any defendant's confrontation rights under *Crawford*.

(b) *There Is No* Bruton *Error*

Defendants further claim that, even if the *Perkins* statements were nontestimonial, their admission at defendants' joint trial violated each defendant's confrontation rights under *Bruton*. We disagree. "In *Bruton*, the United States Supreme Court held that the admission into evidence at a joint trial of a nontestifying codefendant's confession implicating the defendant violates the defendant's right to cross-examination guaranteed by the confrontation clause, even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant." (*People v. Burney* (2009) 47 Cal. 4th 203, 230; *Bruton*, *supra*, 391 U.S. at pp. 127-128, 135-137.) *People v. Aranda* (1965) 63 Cal.2d 518 is the "state analogue" to *Bruton*. (*Almeda*, *supra*, 19 Cal.App.5th at p. 362.) "Broadly stated, the *Aranda/Bruton* rule declares that a defendant is deprived of his or her Sixth Amendment right to confront witnesses when a facially incriminating statement of a nontestifying codefendant is introduced at their joint trial, even if the jury

33

is instructed to consider the statement only against the declarant." (*Gallardo*, *supra*, 18 Cal.App.5th at p. 68.)

Our state Supreme court has recognized that, "because the Confrontation Clause applies only to testimonial hearsay statements, the *Aranda/Bruton* doctrine's Sixth Amendment protections likewise apply only to testimonial hearsay statements." (*Tran, supra,* 13 Cal.5th at p. 1197; *People v. Dalton* (2019) 7 Cal.5th 166, 208 [" 'a statement cannot fall within the confrontation clause unless its primary purpose was testimonial' "]; *People v. Cortez* (2016) 63 Cal.4th 101, 129 [accord] (*Cortez*); *Almeda*, *supra*, 19 Cal.App.5th at p. 362 [same]; *Gallardo*, *supra*, 18 Cal.App.5th at pp. 68-69 [same].) We are bound by *Tran* (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and follow it here. Because the *Perkins* statements were not testimonial, their admission did not violate any defendant's confrontation rights under *Crawford* or the *Aranda/Bruton* doctrine.

### 5. The *Perkins* Statements Did Not Violate Defendants' Due Process Rights

Defendants next claim that the admission of the *Perkins* statements violated their due process rights because the statements rendered their joint trial fundamentally unfair. The admission of evidence that renders a criminal trial fundamentally unfair violates the defendant's due process rights. (U.S. Const., 5th & 14th Amends.; see *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) Defendants argue the *Perkins* statements rendered their trial fundamentally unfair because the statements were unreliable. (See *Michigan v. Bryant*, *supra*, 562 U.S. at p. 370, fn. 13 ["[T]he Due Process Clauses of the

34

Fifth and Fourteenth Amendments may constitute a further bar to admission of, for example, unreliable evidence."].)  But hearsay statements that are sufficiently reliable to be admissible under Evidence Code section 1230 do not violate due process when, as here, the defendant "cites no additional compelling basis for concluding these statements were nonetheless so unreliable that their admission violated the due process clause." (*People v. Dalton*, *supra*, 7 Cal.5th at p. 209.)  As we explain, Ford's and Wright-Patterson's *Perkins* statements were admissible against each defendant as statements against Ford's and Wright-Patterson's respective penal interests.  (Evid. Code, § 1230.) That is, the statements were against Ford's and Wright-Patterson's respective penal interests when made, and the statements were sufficiently reliable to warrant admission despite their hearsay character.  (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)  Thus, the admission of the *Perkins* statements did not violate any defendant's due process rights. (*People v. Dalton*, *supra*, 7 Cal.5th at p. 209.)

6.  The *Perkins* Statements Were Against the Declarants' Penal Interests

(a)  *Legal Principles*

Hearsay, which is an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible under California law.  (*People v. Flinner* (2020) 10 Cal.5th 686, 735; Evid. Code, § 1200.)  " ' "The chief reasons for this general rule of inadmissibility are that the [hearsay] statements are not made under oath, the adverse party has no opportunity to cross-examine the declarant, and the jury cannot observe the declarant's demeanor while making the statements." ' "  (*Gallardo*, *supra*,

35

18 Cal.App.5th at p. 70.)  But there are several exceptions to the hearsay rule, including the declaration against interest exception.  (*People v. Grimes*, *supra*, 1 Cal.5th at p. 710.)

The declaration against interest exception is codified in Evidence Code section 1230, which provides:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."  (Evid. Code, § 1230; *People v. Chhoun* (2021) 11 Cal.5th 1, 47.)  The rationale for the declaration against interest exception, as applied to statements against the declarant's penal interest, in particular, " 'is that "a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest," thereby mitigating the dangers usually associated with the admission of out-of-court statements.' "  (*Ibid*; *People v. Grimes*, *supra*, 1 Cal.5th at p. 711.)  To satisfy the exception, the proponent of the hearsay statement must show:  (1) the declarant is unavailable to testify, (2) the statement, when made, was against the declarant's penal or other interest, and (3) the statement is sufficiently "reliable" or trustworthy to warrant admission despite its hearsay character.  (*Chhoun*, at p. 47; *People v. Geier* (2007) 41 Cal.4th 555, 584, *People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)

"We review the application of the statement against interest exception to the particular facts of a case for abuse of discretion, but whether a trial court has correctly

construed Evidence Code section 1230 is a question of law that we review de novo."
(*People v. Flinner*, *supra*, 10 Cal.5th at p. 735; *People v. Grimes*, *supra*, 1 Cal.5th at pp. 711-712; *Cortez*, *supra*, 63 Cal.4th at p. 125, fn. 5.)  We do not resolve conflicting facts or determine witness credibility; we defer to the trial court's factual determinations if substantial evidence supports them.  (*Almeda*, *supra*, 19 Cal.App.5th at p. 368.)

  (b)  *Analysis*

  The parties agree that the first element of the against interest exception was met regarding Ford's and Wright-Patterson's *Perkins* statements:  Ford and Wright-Patterson were unavailable to testify because they invoked their Fifth Amendment rights not to testify.  (*People v. Seijas*, *supra*, 36 Cal.4th at p. 303; Evid. Code, § 1230.)  Defendants claim, however, that Ford's and Wright-Patterson's *Perkins* statements *implicating each other and Stewart in the McDaniel shooting* did not satisfy the second and third elements of the against interest exception.  (Evid. Code, § 1230.)  That is, defendants argue these *Perkins* statements (1) were not against Ford's and Wright-Patterson's respective penal interests when made, and (2) were insufficiently reliable or trustworthy to warrant admission despite their hearsay character.  We turn to each of these questions.

  (i)  *The* Perkins *Statements Were Against Penal Interests*

  Defendants argue Ford's and Wright-Patterson's *Perkins* statements implicating each other and Stewart in the McDaniel shooting did not qualify as statements against interest (Evid. Code, § 1230) because the statements were not " 'specifically disserving' " of Ford's and Wright-Patterson's respective penal interests.  We find no merit to this claim.

37

As defendants point out, " '[o]nly statements that are specifically disserving to the hearsay declarant's penal interests are admissible as statements against penal interests.' " (*Gallardo*, *supra*, 18 Cal.App.5th at p. 70.) "Evidence Code section 1230 does not authorize the admission of 'those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others.' [Citation] Nor 'does [the statute] not allow admission of non-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory." (*Id*. at p. 71.)

"Stated somewhat differently, the [against interest] exception does not apply 'to collateral assertions within declarations against penal interest.' [Citation.] For example, a hearsay statement ' "which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible." ' " (*Almeda*, *supra*, 19 Cal.App.5th at p. 364; *People v. Duarte*, *supra*, 24 Cal.4th at p. 612.)

" 'This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest.' " (*Gallardo*, *supra*, 18 Cal.App.5th at p. 71.) The declaration against interest exception "permits the 'admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely "self-serving," but "inextricably tied to and part of a specific statement against penal interest." ' " (*Ibid*.) Thus, "statements by a nontestifying codefendant that implicate the defendant, even by name, may be admissible if they are disserving to the codefendant's

interest and are not exculpatory, self-serving, or collateral." (*Almeda*, *supra*, 19 Cal.App.5th at p. 364; *Cortez*, *supra*, 63 Cal.4th at pp. 126-128.)

" '[W]hether a statement is self-inculpatory or not can only be determined by viewing the statement in context.' " (*People v. Grimes*, *supra*, 1 Cal.5th at p. 716.)  A codefendant's statement implicating another defendant is " 'more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility . . . .' " (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 71-72.) " 'Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others.  "[O]nce partners in crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." [Citation.]  However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures.' " (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 175, quoting *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.)

" 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Grimes*, *supra*, 1 Cal.5th at p. 711; quoting *People v. Frierson* (1991) 53 Cal.3d 730, 745.)  " ' "The question . . . is always whether the statement was sufficiently against the declarant's penal interest such 'that a

39

reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." ' " (*Almeda*, *supra*, 19 Cal.App.5th at p. 365; *Gallardo*, *supra*, 18 Cal.App.5th at pp. 71-72.)

Here, Ford's and Wright-Patterson's *Perkins* statements implicating each other and Stewart in the McDaniel shooting were specifically disserving of Ford's and Wright-Patterson's respective penal interests because the statements were " 'inextricably tied to and part of' " Ford's and Wright-Patterson's statements against their own penal interests. (*People v. Grimes*, *supra*, 1 Cal.5th at p. 716; *Gallardo*, *supra*, 18 Cal.App.5th at p. 71.)

*Cortez* is instructive. There, the defendant was jointly tried with a codefendant on charges arising from a drive by shooting. (*Cortez*, *supra*, 63 Cal.4th at p. 105.) The trial court admitted a recorded police interview with the codefendant's nephew in which the nephew said the codefendant told the nephew that the defendant " 'was the one driving' " and the codefendant " 'was the one shooting.' " (*Id*. at pp. 107-108, 127.) The *Cortez* court concluded that the codefendant's statement implicating the defendant as the driver was admissible against the defendant as a statement against the codefendant's penal interest. (*Id*. at pp. 107-108, 125-130.) *Cortez* reasoned that the codefendant's statements identifying the defendant were specifically disserving to the codefendant's penal interests in several respects. (*Id.* at pp. 126-128.)

First, the codefendant's references to the defendant, along with other evidence, "suggested [the codefendant] and [the defendant] had engaged in a joint, planned drive-by shooting, thus showing premeditation and implicating [the codefendant] in a

40

conspiracy to commit murder by means of a drive-by shooting." (*Cortez*, *supra*, 63 Cal.4th at p. 126.) Second, when the codefendant made the statements identifying the defendant as the driver, he was providing information that was "increasing the likelihood that evidence connecting him to the shooting would be found." (*Id*. at p. 127.) On this point, *Cortez* noted, "statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest." (*Ibid*.)

Third, nothing in the record "undermine[d] the trial court's conclusion" that the codefendant's statements identifying the defendant as the driver were "truly disserving" of the codefendant's penal interest; that is, the portions of the codefendant's statement identifying the defendant as the driver " 'were in no way exculpatory' or 'self-serving,' " of the codefendant's penal interests. (*Cortez*, *supra*, 63 Cal.4th. at p. 128.) Rather, the codefendant " ' consistently assigned most blame to himself . . . and . . . never attempted to shift blame . . . ." (*Ibid*.) Fourth, "the context in which [the codefendant] made the statements—a conversation with a close family member in an apartment he frequented— [did] not suggest that [the codefendant] was trying to improve his situation with police." (*Ibid*.) The " 'setting' " for the conversation " 'promoted truthfulness.' " (*Ibid*.) That is, the codefendant's statements were sufficiently trustworthy to warrant their admission.

Given "the totality of the circumstances," *Cortez* concluded that the trial court did not abuse its discretion in finding that the co-defendant's identification of the defendant as the driver " 'so far subjected [the codefendant] to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he

41

believed it to be true.' " (*Cortez, supra,* 63 Cal.4th at p. 128.) The circumstances and factors present in *Cortez* are present here.

First, Ford's and Wright-Patterson's *Perkins* statements implicating each other and Stewart in the McDaniel shooting were specifically disserving of Ford's and Wright-Patterson's respective penal interests. The statements showed all three defendants were part of a conspiracy with each other, and acted in concert with each other, to shoot and kill a NAW gang member or affiliate in retaliation for the Lawton shooting. (*Cortez, supra,* 63 Cal.4th at pp. 126-127; see *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176 [statements by a codefendant that he shot one man and that the defendant shot another man incriminated the codefendant by showing he "act[ed] in concert" with the defendant in shooting the two males].)[9]

Second, Ford's and Wright-Patterson's statements implicating each other and Stewart in the McDaniel shooting included details of the shooting that increased the likelihood that Ford and Wright-Patterson would be connected to the shooting through other evidence. (*Cortez, supra,* 63 Cal.4th at p. 127; *Almeda, supra,* 19 Cal.App.5th at p. 365.) The statements included details of the shooting that only the shooters would

---

[9] As noted, Ford told the agent that Ford, Stewart, and Wright-Patterson went to McDaniel's house to retaliate for the Lawton L. shooting. Ford said he had a "Mac" gun; he gave a ".380" gun to Wright-Patterson; Ford shot and killed McDaniel with the Mack gun; Wright-Patterson shot at McDaniel with the .380 gun but did not hit McDaniel; and Stewart "stayed in the car" during the shooting and "didn't see nothing" but "knew what happened." Likewise, Wright-Patterson told the agent that Ford shot and killed McDaniel with the larger gun; Wright-Patterson used a .380 gun that Ford gave him but only fired it "up in the air"; and Stewart "set everything up" and drove them to McDaniel's house because Stewart knew that the person who "ran" the NAW gang lived in McDaniel's house.

know, and other evidence corroborated the statements. Ford and Wright-Patterson told the agent that Wright-Patterson used a .380 gun that Ford gave him and Ford used a larger "Mac" gun. Wright-Patterson also said the .380 gun only had four bullets. Ford said he kept the .380 gun after Wright-Patterson returned it to him after the shooting.

At the scene of the shooting, investigators found four .380-caliber shell casings, all fired from a .380 gun found in Ford's possession five days after the shooting, corroborating Wright-Patterson's statement that the .380 gun only had four bullets. Other evidence also showed that a single .45-caliber bullet pierced the front security door of McDaniel's house and lodged in McDaniel's neck, corroborating Ford's statement that he used a larger gun than Wright-Patterson, and that he shot and killed McDaniel from outside the house after McDaniel appeared at the front door. The surveillance video also showed *two persons* walking to McDaniel's house, corroborating Ford's statement that he and Wright-Patterson walked up to McDaniel's house while Stewart stayed in the car.

Third, the portions of Ford's and Wright-Patterson's statements implicating each other and Stewart in the McDaniel shooting " 'were in no way exculpatory' " or " 'self-serving' " of Ford or Wright-Patterson. (*Cortez*, *supra*, 63 Cal.4th at p. 128.) To the contrary, Ford " 'consistently assigned the most of the blame to himself' " by admitting he was the one who shot and killed McDaniel. (*Ibid.*) Ford even boasted about being the person who fired the fatal shot. Ford did not attempt to shift blame for his role in the shooting to Wright-Patterson, Stewart, or anyone else.

Likewise, although Wright-Patterson attempted to minimize the significance of his role in the shooting, Wright-Patterson did not attempt to shift blame *for his role* in the

43

shooting. Wright-Patterson claimed he only shot the .380 gun "up in the air," and he did not shoot at anything or anyone. Wright-Patterson also tried to convince the agent that he was not culpable in the shooting. But in describing his own, Ford's, and Stewart's respective roles in the shooting, Wright-Patterson did not attempt to shift blame for his own role in the shooting to Ford, Stewart, or anyone else. Fourth, the setting of the *Perkins* statements " ' promoted truthfulness.' " (*Cortez*, *supra*, 63 Cal.4th at p. 128.) The record shows that Ford and Wright- Patterson were comfortable speaking with the agent, and they believed the agent was an older gang member trying to help them. Ford and Wright-Patterson spoke very frankly and unequivocally with the agent about the McDaniel shooting.

Thus, based on the content of the statements and the totality of the circumstances surrounding the statements, the trial court did not abuse its discretion in concluding that Ford's and Wright Patterson's *Perkins* statements implicating each other and Stewart in the McDaniel shooting were against Ford's and Wright-Patterson's respective penal interests. The statements were specifically disserving of Ford's and Wright-Patterson's respective penal interests, in that the statements were " 'inextricably tied to and part of' " Ford's and Wright-Patterson's statements implicating themselves in the McDaniel shooting, and the statements were not " 'exculpatory, self-serving, or collateral' " to Ford's and Wright-Patterson's respective penal interests. (*People v. Grimes*, *supra*, 1 Cal.5th at p. 715; *Cortez*, *supra*, 63 Cal.4th at pp. 126-128; *Almeda*, *supra*, 19 Cal.App.4th at p. 364; *Gallardo*, *supra*, 18 Cal.App.5th at p. 71.)

44

Stewart argues Wright-Patterson's Perkins statements were inadmissible under the declaration against interest exception because Wright-Patterson tried to shift blame for the shooting to Ford and Stewart. (*Gallardo*, *supra*, 18 Cal.App.5th at p. 74.) Stewart points out that Wright-Patterson claimed he only shot "up in the air" and "didn't hit nothing," and when the agent asked what Wright-Patterson was going to use in his defense he said, "they made me do it." Stewart also notes that Wright-Patterson's statements implicating Stewart were made in the "context of [Wright-Patterson] explaining how he [(Wright-Patterson)] was less culpable than [Ford and Stewart]." Wright-Patterson said, "I didn't even shoot at the house . . . . [¶] BG had already killed [him] . . . . I just started shootin' up in the air because I didn't even shoot at the house or nothing. . . . I didn't' shoot at nobody . . . . [¶] . . . [¶] I'm gonna save my ass." As discussed, however, although Wright-Patterson was trying to convince the agent that he was not culpable in the McDaniel shooting, none of Wright-Patterson's statements attempted to shift blame for Wright-Patterson's role in the McDaniel shooting to Ford, Stewart, or anyone else.

Stewart's reliance on *Gallardo* is also misplaced. In *Gallardo*, four defendants, Angel, Michael, Garcia, and Ramos, were tried together on charges stemming from a shooting at an occupied vehicle. (*Gallardo*, *supra*, 18 Cal.App.5th at p. 55.) Michael and Garcia claimed that Angel's statements implicating them as the driver and shooter, respectively, were improperly admitted as statements against Angel's penal interest. (*Id.* at p. 56.) The *Gallardo* court agreed and reversed Michael's and Garcia's convictions. (*Id.* at pp. 70-75, 86.) The jury did not reach a verdict on Ramos. (*Ibid.*)

45

Several months after the shooting, Angel was in county jail on unrelated charges. (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 56-57, 59.) Angel was placed in a jail cell with two government informants, both former members of the " 'Sureno' " gang, to elicit information from Angel about the shooting. (*Id*. at p. 59.) The *Gallardo* court limited its analysis to two categories of statements in the 40-page transcript of Angel's conversation with the informants: (1) Angel's affirmative responses to the informants' inquiries regarding whether Garcia was the shooter, and (2) Angel's identification of Michael as the driver of the vehicle from which the shots were fired. (*Id*. at pp. 72-73.) The *Gallardo* court concluded that Angel's statements implicating Garcia as the shooter and Michael as the driver were " ' "self-serving and unreliable[,]" ' " considering "the content of the statements and the context in which they were made." (*Id*. at p. 74.)

*Gallardo* relied on several factors to support this conclusion. First, in speaking with the informants, Angel repeatedly complained that law enforcement and a "snitch" were trying to "pin all of the blame" for the shooting on Angel. (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 73-74.) Second, the informants asked Angel leading questions. (*Id*. at p. 75.) Third, Angel provided details of the shooting that conflicted with his initial statements identifying Garcia as the shooter and Michael as the driver. (*Id*. at pp. 73-74) Fourth, Angel minimized his role in the shooting by claiming he was driving a second vehicle that was not used in the shooting. (*Id*. at pp. 73-75.) Fifth, by the time Angel identified Garcia and Michael to the informants, Angel "had already made a series of highly incriminating statements to the informants that essentially acknowledged his participation in the crime." (*Id*. at p. 74.) For example, Angel identified himself as a

46

member of a rival gang to the shooting victims' gang, provided details of the shooting, and admitted he " 'knew what happened.' " (*Ibid*.} *Gallardo* reasoned that, given Angel's "prior admissions" of his own culpability, Angel's subsequent statements "identifying Garcia as the shooter and Michael as the driver . . . *did little to increase Angel's criminal culpability, and served primarily to* 'minimize [*Angel's*] *role and place the blame . . . on* [*his accomplices*[*s*]].' " (*Ibid*., italics added.) *Gallardo* explained that Angel did not "merely implicate" the codefendants "without ever attempting to shift blame." (*Id*. at p. 75.)

Relying on *Gallardo*, Stewart argues that Ford's *Perkins* statements identifying Stewart *by name* as the driver were not specifically disserving of Ford's penal interest because "Ford's culpability remained the same irrespective of the driver's name. And by the time of that statement, Ford had already given the informant a detailed account of how he had participated in the charged shooting with another shooter and with [an unnamed] driver who never got out of the car. . . . In light of those prior admissions, telling the informant the driver's name 'did little to increase' Ford's culpability." (*Gallardo*, *supra*, 18 Cal.App.5th at p. 74.)

Also relying on *Gallardo*, Stewart claims Ford's identification of Stewart as the driver was not " 'inextricably tied to and part of' any other specific statement that was actually against Ford's penal interest." Stewart acknowledges that when the agent asked Ford who "Four Bang" was, Ford responded that Four Bang was the driver. But Stewart points out, "*this was separate from Ford's earlier descriptions of the charged shooting*

47

*and of how the driver—at that point still unidentified—hadn't gotten out of the car*."
(Italics added.)

Stewart argues, "[t]he same goes for Wright-Patterson's statements" identifying Stewart by name as the driver: "Just like with Ford, Wright-Patterson's culpability remained the same regardless of the driver's name or the car's owner. These statements were also made after Wright-Patterson had already admitted his involvement" in the shooting.

We find these arguments unpersuasive. In context, it is immaterial that Ford and Wright-Patterson identified Stewart *by name* as the driver only *after* they described their own roles in the shooting. (Cf. *Gallardo*, *supra*, 18 Cal.App.5th at pp. 72-74.) When Ford's and Wright-Patterson's *Perkins* statements are read as a whole, it is clear that their subsequent identifications of Stewart *by name* only lent credibility to their earlier statements implicating Stewart as the person who planned the shooting and drove Ford and Wright-Patterson to the scene of the shooting.

Ford's and Wright-Patterson's statements identifying Stewart by name differ in critical respects from Angel's unreliable statements implicating Angel's codefendants in *Gallardo*. As discussed, neither Ford nor Wright-Patterson attempted to shift blame for their respective roles in the shooting to each other, Stewart, or anyone else. (Cf. *Gallardo*, *supra*, 18 Cal.App.5th at pp. 74.) Further, neither Ford nor Wright-Patterson made inconsistent statements about each other's or Stewart's respective roles in the shooting. Rather, Ford's and Wright-Patterson's accounts of each other's and Stewart's roles in the shooting, and the details of the shooting, were consistent, both internally and

48

with each other's *Perkins* statements. Ford and Wright-Patterson consistently described the scene of the shooting and the types of guns used, and both said Stewart was the driver. Thus, the *Gallardo* court's criticisms of Angel's statements do not apply to Ford's or Wright-Patterson's *Perkins* statements. (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 72-74.)[10]

Stewart also claims the trial court's ruling was "flawed" because the court failed to "analyze each statement separately" and, instead, "allowed the jury to hear" the "entire conversations" between the agent and Ford, and between the agent and Wright-Patterson. (*Gallardo*, *supra*, 18 Cal.Ap.5th at p. 72.) Stewart complains that, "this allowed the jury to hear," not only the portions of Ford's and Wright-Patterson's statements implicating Stewart in the McDaniel shooting, but also "their lengthy discussions. . . about whether [Stewart] could have been snitching on them, about how [Stewart] had been to prison before, and about how police had shown them pictures of [Stewart] and made clear that he was a suspect, when these discussions were not even relevant in the first place because they did not have any tendency in reason to prove or disprove the identity or mental state of the perpetrators."

---

[10] Stewart points out that, near the beginning of his conversation with the agent, Wright-Patterson said he was " 'a driver and a shooter,' " Ford was a "shooter too," Ford " 'knocked somebody down,' " and he, Wright-Patterson, " 'shot the other [n].' " Stewart claims these statements were inconsistent with Wright-Patterson's subsequent statements that Stewart "drove there" and that Wright-Patterson shot "up in the air." But Wright-Patterson's *Perkins* statements as a whole show that Wright-Patterson was not talking about the McDaniel shooting, but another shooting, when Wright-Patterson mentioned being "a driver and a shooter." Wright-Patterson consistently said that Ford shot and killed McDaniel, and that he, Wright-Patterson, only shot in the air.

As Stewart observes, *Gallardo* criticized the trial court for admitting "the entire 40-page transcript" of Angel's statement to the informants based on the trial court's finding that "certain details*"* showed the statement was "sufficiently trustworthy to warrant its inclusion as a declaration against interest."  *Gallardo* reasoned that the court's "implied conclusion— . . . that every statement Angel made implicating his codefendants was sufficiently against his penal interest—cannot withstand scrutiny even under the deferential abuse of discretion standard."  (*Gallardo*, *supra*, 18 Cal.App.5th at p. 72.)

As discussed, however, the facts of this case differ significantly from *Gallardo*. Here, the trial court could have reasonably concluded that Ford's and Wright-Patterson's entire conversations with the agent about the McDaniel shooting were admissible as statements against their respective penal interests, given that the conversations allowed the jury to see the full content of the conversations and judge the credibility of the statements based on the entire content of the conversations.  Additionally, courts are not required "to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant."  (*People v. Grimes*, *supra*, 1 Cal.5th at p. 716.)  Thus, to the extent the *Perkins* statements included collateral statements that were not in and of themselves specifically disserving to the declarants' respective penal interests, there was no error in admitting the entire *Perkins* conversations.

(ii)  *The* Perkins *Statements Were Trustworthy*

As we next explain, Ford's and Wright-Patterson's *Perkins* statements implicating each other and Stewart in the McDaniel shooting were also sufficiently reliable or trustworthy to warrant admission despite their hearsay character.  (*People v. Grimes*,

50

*supra*, 1 Cal.5th at p. 711.) We note there is some confusion concerning the standard of review. The People claim we independently review the trial court's trustworthiness determination, citing *People v. Tran* (2013) 215 Cal.App.4th 1207 at page 1218. (See *People v. Cervantes*, *supra*, 118 Cal.App.4th at pp. 174-175.) In more recent cases, however, our state Supreme Court has not followed these authorities, and has indicated that the abuse of discretion standard applies to the trial court's trustworthiness determination. (*Cortez*, *supra*, 63 Cal.4th at p. 125, fn. 5; *People v. Grimes*, at pp. 711-712; *People v. Dalton*, *supra*, 7 Cal.5th at p. 207.) We conclude that the *Perkins* statements were trustworthy under either standard.

As our cases have emphasized, " ' "[t]here is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made." ' " (*People v. Smith* (2017) 10 Cal.App.5th 297, 303. " '[E]ven when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. . . . [¶] . . . [A]ssessing trustworthiness " 'requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.' " ' " (*People v. Geier* (2007) 41 Cal.4th 555, 584; *People v. Smith*, at p. 304.)

For the same reasons the *Perkins* statements were against Ford's and Wright-Patterson's penal interest, the statements were sufficiently trustworthy. The entire

content of the *Perkins* conversations, and the circumstances in which the conversations took place, do not indicate that either Ford or Wright-Patterson made any of the statements to the agent to "improve [their] situation with police."  (*Cortez*, *supra*, 63 Cal.4th at p. 128.)  Rather, substantial evidence shows that Ford and Wright-Patterson thought they were making the statements in confidence to an older gang member and fellow jail inmate, not a government informant.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 144 [Statements are "more trustworthy" when "spoken in confidence in the expectation they [will] not be repeated to authorities."].)  Thus here, as in *Cortez*, "the 'setting' " of the statements makes them more "trustworthy."  (*Cortez*, at p. 128.)  As we have also explained, neither Ford nor Wright-Patterson attempted to shift blame for their roles in the McDaniel shooting, and their statements included details that only the shooters would know and that increased the likelihood that law enforcement would find evidence connecting them to shooting.  (*Id*. at pp. 127-128; *Almeda*, *supra*, 19 Cal.App.5th at pp. 367-368.)

Stewart argues the *Perkins* statements were insufficiently trustworthy to qualify for admission under the declaration against interest exception.  Stewart points out that, "[t]hese statements were made after the codefendants had already been arrested [on other charges], and during these [*Perkins*] operations, police made clear to [Ford and Wright-Patterson] that they [and Stewart] were suspects in the [McDaniel] shooting."  Stewart notes, "the least reliable circumstance" for a statement against interest "is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others."  (*People v. Greenberger*, *supra*,

52

58 Cal.App.4th at p. 335.)  Again, however, nothing in the *Perkins* statements indicates that Ford or Wright-Patterson, by talking to the agent, were trying to improve their situations with police or deflect criminal responsibility for their roles in the McDaniel shooting onto others.  Moreover, nothing shows that either defendant believe that they were speaking to a law enforcement officer.

Stewart points out that, like Angel's conversation with the informants in *Gallardo*, Ford's and Wright's Patterson's "entire conversations with the [agent] centered around trying to figure out who could've been snitching on them."  But again, nothing indicates that Ford's or Wright-Patterson's descriptions of Stewart's involvement in the McDaniel shooting "were intended, [in any] part, to mitigate [their] own blameworthiness." (*Gallardo*, *supra*, 18 Cal.App.5th at p. 74.)  It is also immaterial that Ford and Wright-Patterson made the statements in response to the agent's "specific questions."  (Cf. *Gallardo*, at pp. 70-75 [Statements in response to leading questions were self-serving and unreliable based on their content and circumstances].)  The record shows that Ford and Wright-Patterson spoke frankly and openly with the agent, and their statements to the agent were not prompted by leading questions.

Stewart further argues the *Perkins* statements are untrustworthy because Ford and Wright-Patterson "ultimately" "admitted," in their holding cell conversations with Stewart, that their *Perkins* statements about Stewart's involvement "were lies."  But, as noted, "[w]e do not  resolve conflicting facts or determine witness credibility." (*Almeda*, *supra*, 19 Cal.App.5th at p. 368.)  The record supports a reasonable inference, and the trial court reasonably could have concluded, that in their holding cell conversations with

53

Stewart, Ford and Wright-Patterson agreed to "clear" Stewart's name by *saying* they lied to the agent, not because they actually lied to the agent.

Lastly, Stewart claims the trustworthiness of the statements "must also be assessed in the context of the perceived gang atmosphere in which they were made." Stewart argues that, although the declaration against interest exception is "premised on the notion that the average civilian would be unlikely to falsely admit to involvement in a crime (see *People v. Grimes*, *supra*, 1 Cal.5th at p. 711), people with gang affiliations commonly brag about committing crimes as a way of getting respect and enhancing their reputation." Stewart notes that Wright-Patterson "bragged" to the agent about how he had committed "other assaults and robberies," and Ford "bragged" to the agent about other crimes he had committed, including other shootings. Stewart claims Ford and Wright-Patterson had "motives to claim credit for committing crimes as a way of inflating their own gang reputations [to the perceived gang-affiliated agent] even if their claims were not true." Again, "[w]e do not resolve conflicting facts or determine witness credibility." (*Almeda*, *supra*, 19 Cal.App.5th at p. 365.) The evidence supports a reasonable inference that Ford's and Wright-Patterson's Perkins statements implicating each other and Stewart in the McDaniel shooting were trustworthy—" ' "so trustworthy that adversarial testing would add little to [their] reliability . . . ." ' " (*People v. Arceo*, *supra*, 195 Cal.App.4th at p. 578.)

In sum, the content of the *Perkins* statements and the circumstances in which they were made show the statements were against Ford's and Wright-Patterson's penal interests, and were sufficiently reliable or trustworthy to warrant admission despite their

54

hearsay character, under Evidence Code section 1230.  (*People v. Grimes*, *supra*, 1 Cal.5th at p. 711.)  Reasonable men in Ford's and Wright-Patterson's positions would not have made the *Perkins* statements unless they believed them to be true.  (*Id*. at p. 716.)

B.  *Ford and Wright-Patterson Cannot Show Prejudicial Ineffective Assistance of Counsel Based on Their Counsels' Failure to Object to the Holding Cell Recordings*

Ford and Wright-Patterson claim their trial counsel rendered ineffective assistance of counsel in failing to ask for (1) separate juries or (2) a limiting instruction, in response to Stewart's motion *in limine* to adduce, in Stewart's defense, the holding cell recordings—the audio recordings of Ford's and Wright-Patterson's respective holding area conversations with Stewart.  Ford and Wright-Patterson claim that, if the trial court refused to order separate juries, their counsel should have asked for a limiting instruction telling the jury it could consider the holding cell conversations only in determining the charges and allegations against Stewart but not in considering the charges and allegations against Ford and Wright-Patterson.  We conclude that Ford and Wright-Patterson have not shown, and on this record cannot show, that they were prejudiced by their counsels' failure to ask for a limiting instruction or separate juries based on the holding cell recordings.

1.  Background

Counsel for Ford and Wright-Patterson did not object to Stewart's motion in limine to admit the holding cell recordings.  Counsel for Stewart argued that the holding cell recordings would show that Ford and Wright-Patterson, contrary to their *Perkins*

55

statements, said that "Stewart was not involved in the [McDaniel shooting], that they made it up, and that they would clear Stewart's name by speaking to their attorneys to that effect." Stewart's counsel also argued, and the court and counsel agreed, that the holding area conversations were admissible to impeach Ford's and Wright-Patterson's *Perkins* statements implicating Stewart in the McDaniel shooting. (Evid. Code, § 1202.)

As discussed, Stewart's counsel played the holding cell recordings in their entirety in Stewart's defense case. After the recordings were played, Ford's and Wright-Patterson's counsel moved for a mistrial on the ground they were not included in the pretrial "meet and confer" discussion between Stewart and the prosecutor, regarding Stewart's presentation of the recordings, and they did not know what the jury was going to hear in the recordings.

The court acknowledged that it should have reviewed the recordings before they were played for the jury and ensured that counsel had an opportunity to object to their content. The court also said that if it had "heard the entire tape, [it] would have come to the conclusion that only about two of the pages would be played." But, the court said, "that ship has sailed . . . ." The court denied the mistrial motion and ruled, as it had ruled *in limine*, that the recordings were admissible to impeach the *Perkins* statements. (Evid. Code, § 1202.)

In closing argument, the prosecutor argued the holding cell recordings showed that Ford's and Wright-Patterson's *Perkins* statements implicating themselves, each other, and Stewart in the McDaniel shooting, were true. The prosecutor argued that, in each

holding cell conversation, Ford and Wright-Patterson agreed to "clear" Stewart's name only after Stewart intimidated them to do so.

2. Legal Principles

"[T]he Sixth Amendment [to the United States Constitution] guarantees not only the right to the assistance of counsel but also the right to the *effective assistance* of counsel . . . ." (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1103-1104.) "A defendant seeking relief on the basis of ineffective assistance [of counsel] must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 615; *People v. Kidane* (2021) 60 Cal.App.5th 817.) In other words, the "defendant has the burden of establishing that (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice." (*People v. Noriega* (2015) 237 Cal.App.4th 991, 1002-1003; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692.)

Section 1098 reflects a strong Legislative preference for joint trials. (*People v. Souza* (2012) 54 Cal.4th 90, 109.) "[U]nder section 1098, 'a trial court *must* order a joint trial as the "rule" and *may* order separate trials only as an "exception." ' " (*People v. Mackey* (2015) 233 Cal.App.4th 32, 99.) "A 'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims." (*People v. Keenan* (1988) 46 Cal.3d 478, 500-501.) " '[I]mportant concerns of

57

public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against [the] ensuing charges.' " (*People v. Sanchez* (2016) 63 Cal.4th 411, 464.)

A trial "court has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial." (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 464.) But "[a] joint trial is not unfair simply because the codefendants 'have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution. [Citation.]' [Citation.] If the likelihood of antagonistic testimony alone required separate trials, they 'would appear to be mandatory in almost every case.' " (*People v. Keenan*, *supra*, 46 Cal.3d at p. 500.)

3. Analysis

Ford and Wright-Patterson claim their counsel were deficient in failing to request separate juries or a limiting instruction based on the holding cell recordings. They claim the court "would have" granted one of these requests because the recordings "exculpated" Stewart and "inculpated" them. They argue "a defense lawyer's failure to object to the admission of damaging and inadmissible evidence can lead to a finding of ineffectiveness," relying on *People v. Robertson* (1982) 33 Cal.3d 21, 40-42 [counsel's performance deficient for failing to object to other crimes evidence under Evidence Code section 352, but error harmless]; and *People v. Guizar* (1986) 180 Cal.App.3d 487, 491-492 [same].)

58

Ford specifically argues his holding cell statements were damaging to him because they were self-inculpatory and "directly supported the state's theory" that Ford's *Perkins* statements were credible. Ford points out that, when Stewart asked Ford to clear Stewart's name in the McDaniel shooting, Ford did not deny his own involvement in the shooting. Ford argues his counsel's inaction also allowed the jury to hear Ford say that Ford planned to tell "a made up story;" that Ford would say he lied in his Perkins statements; he knew he was talking to a government agent, and he he was "playing with" the agent; Ford "threw some names in there" of people who had nothing to do with the McDaniel shooting; Ford got himself "deep in some shit"; and Ford was found in possession of a gun used in the McDaniel shooting. Ford argues, "no competent defense lawyer would make a *reasonable* tactical decision to allow the jury to hear such evidence." Wright-Patterson argues his holding cell statements were similarly damaging to him. Among other things, the jury heard Wright-Patterson tell Stewart that he "told [his] cellie a little bit too much," and he would claim he lied to the agent to clear Stewart's name in the McDaniel shooting.

On this record, however, Ford and Wright-Patterson cannot show prove either prong of their ineffective assistance claims, namely, that (1) their counsel were deficient in failing to request separate juries or limiting instructions, based on the holding cell recordings, or (2) they suffered prejudice as a result of their counsels' omissions. (See *People v. Cudjo*, *supra*, 6 Cal.4th at p. 623.) When raised on appeal, a claim of ineffective assistance of counsel must be rejected if " ' "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel

was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation". . . .' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) Here, the record shows there is a satisfactory explanation, "a plausible tactical reason," for counsels' failure to object to the holding cell recordings. (*People v. Henderson* (2020) 46 Cal.App.5th 533, 549.) Stewart's counsel proffered the holding cell recordings to impeach Ford's and Wright-Patterson's *Perkins* statements, arguing the recordings would show that Ford and Wright-Patterson later said that they and Stewart were not involved in the McDaniel shooting, and that they "made up" their *Perkins* statements, knowing the agent was a government informant.

In light of Stewart's position, counsel for Ford and Wright-Patterson reasonably could have determined that the holding cell recordings would benefit Ford and Wright-Patterson, just as they would benefit Stewart, by showing that Ford and Wright-Patterson lied to the agent, knowing the agent was a government informant, and that their *Perkins* statements implicating themselves and Stewart in the McDaniel shooting were not true. Indeed, counsel reasonably could have believed that the holding cell recordings could cause jurors to reasonably doubt that Ford and Wright-Patterson were being truthful in their *Perkins* statements, and were instead lying to agent to "fit in." In this view, the holding cell recordings were beneficial, not damaging, to Ford and Wright-Patterson.

As we have noted, however, counsel for Ford and Wright-Patterson did not have an opportunity to listen to the holding cell recordings until they were played for the jury. Thus, counsel did not fully assess whether the recordings were beneficial or damaging to Ford and Wright-Patterson. But even if counsel did not have "a plausible tactical reason"

60

(*People v. Henderson*, *supra*, 46 Cal.App.5th at p. 549) for failing to ask for separate juries or limiting instructions based on the recordings; Ford and Wright-Patterson have not shown they were prejudiced by their counsels' omissions.

"If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150.) "[P]rejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) We discern no reasonable probability that Ford or Wright-Patterson would have realized a more favorable result on any of the charges or allegations (1) if they had had separate juries who did not hear the holding cell recordings, or (2) if the jury been instructed not to consider recordings against them.

Notwithstanding the holding cell recordings, the evidence that Ford shot and killed McDaniel, and that Wright-Patterson directly aided and abetted Ford in the murder, was very strong, even overwhelming. In their *Perkins* statements, Ford and Wright-Patterson confessed to their roles in the McDaniel shooting. Ford said he shot and killed McDaniel with a larger gun while Wright-Patterson used and fired a .380. The *Perkins* statements also showed that Stewart drove Ford and Wright-Patterson to McDaniel's house because Stewart knew that a high-ranking NAW gang member lived there, and that Ford, Wright-Patterson, and Stewart premeditated the murder, and acted in concert to commit the murder, in order to retaliate against the NAW gang for the Lawton shooting.

As discussed, Ford's and Wright-Patterson's respective *Perkins* statements were consistent with each other's *Perkins* statements and the physical evidence of the shooting. The four .380-caliber casings found outside the front door area of McDaniel's house, and the single bullet hole found in the front screened security door, corroborated Ford's and Wright-Patterson's *Perkins* statements that (1) Ford shot and killed McDaniel, by firing a single shot through the security door, after McDaniel walked up to the door, and (2) Wright-Patterson went with Ford to McDaniel's house and fired a .380 handgun after Ford fired the .45 handgun. Other evidence showed Ford was bragging about the shooting on social media, and only four days after the shooting, Ford was arrested with a .380 handgun, later determined to be the .380 handgun that fired the four shell casings found outside McDaniel's house. In sum, in light of the *Perkins* statements and the physical evidence corroborating them, there is no reasonable probability Ford or Wright-Patterson would have realized a more favorable result had the holding cell recordings not been admitted against them, or had they had a separate jury or juries that did not hear the recordings.

C. *Ford and Wright-Patterson Cannot Show Their Counsel Were Ineffective For Failing To Object to the Other Crimes and Uncharged Criminal Conduct Evidence*

Ford and Wright-Patterson also claim their counsel rendered ineffective assistance in failing to object to the prosecution's introduction of evidence that Ford and Wright-Patterson had committed other crimes, or had engaged in other criminal conduct, unrelated to the McDaniel shooting. These claims fail because defendants cannot show

they were prejudiced by the evidence they committed other crimes or engaged in other criminal conduct.

1. The Other Crimes Evidence Against Ford

Before the People presented the *Perkins* statements, the jury heard that Ford was arrested and charged with two counts of attempted murder, following a May 4, 2018 traffic stop. California Highway Patrol officer Kenneth Phillips testified he arrested Ford that day, in connection with a drive-by shooting that day in which Ford shot two people, including K.C. The jury heard extensive details about Ford's arrest. In an interview following his arrest, Ford told Officer Phillips, " 'I started shooting at that bitch ass [n-word],' " and " 'I tried to kill him.' " Ford explained why he tried to kill K.C.: " 'When I was in jail, I heard he tried to fight my baby mama or something like that.' " Officer Phillips recovered .40-caliber shell casings from the scene of the drive-by shooting. Ford said he got the .40-caliber handgun "a few days earlier when he got out of jail," and *he knew* he shot a second victim, besides K.C. Officer Phillips also testified Ford was on probation "for two different cases" on May 4, 2018.

At this point in Officer's Phillips' testimony, the court called a bench conference and asked whether there had been an Evidence Code section 402 hearing on the officer's testimony about the May 2018 drive-by shooting, and Ford's statements to the officer about the shooting. The prosecutor said she "believe[d]" it had been part of her "motions in limine" "to bring . . . up" this evidence because Ford "mention[ed] all this" in his *Perkins* statements. The prosecutor argued that Ford's statements to the officer about the May 2018 shooting "corroborate[d] everything [Ford] said in [his *Perkins*] statement[s],"

63

and the People were offering Ford's interview statements for that purpose. Without Ford's statements to the officer, the prosecutor argued a layperson might believe Ford was "making up" what Ford said in his *Perkins* statements when, in fact, Ford was telling the truth. In his May 23, 2018 *Perkins* statements, Ford told the agent he was being charged with "two attempted murders"; he had two strikes; and he was on probation in two different cases, "a felony gun case and then a felony gun case with a gang enhancement."

The court responded that the prosecutor had gone "into a lot of detail" about the May 2018 drive-by shooting, and the court could have "sanitized some of it." Ford's counsel noted he had "originally objected" to Ford's interview statements about the May 2018 drive-by shooting as unduly prejudicial. (Evid. Code, § 352.) Ford's counsel then joined Stewart's counsel's motion to give a limiting instruction that the jury could only use the evidence of the May 2018 shooting, and Ford's interview statements about that shooting, against Ford. The court ruled it would allow the evidence and would give a limiting instruction "at the appropriate time." On redirect examination following the bench conference, Officer Phillips testified that Ford had been charged with two counts of attempted murder and a gun use allegation based on the May 2018 drive-by shooting.

After Officer Phillips concluded testifying, the court told the jury, "when we come back, I'll give you another instruction" regarding the evidence of Ford's arrest on the attempted murder charges. The court said, "The fact that he was charged with another crime is not evidence. You're not to—it's not evidence of his guilt, and you're not to consider that." Later, the court instructed the jury pursuant to CALCRIM No. 304 that

64

the jury could only consider Officer Phillips' testimony about the May 2018 drive by shooting attempted murder charges against Ford: "You heard testimony from Officer Phillips relating to an investigation of attempted murder involving . . . Ford. This evidence was admitted only against Ford. You must not consider that evidence against any other defendant."

2. The Other Crimes Evidence Against Wright-Patterson

In his June 27, 2018 *Perkins* statements, Wright-Patterson made references to an unrelated shooting he and Ford had been involved in. Wright-Patterson said, "I was a driver and a shooter . . . . [Ford] was a shooter too. And so if he tell on me he tellin' on himself . . . ." Regarding the same shooting, Wright-Patterson said that Ford "knocked somebody down," and "I shot the other[n-word]." Wright-Patterson later told the agent he had done "plenty of licks," and he had been "on the run." In his holding cell conversation with Stewart, Wright-Patterson said he had "busted on" People on behalf of the 4CHC gang. The prosecutor argued these statements showed Wright-Patterson was admitting he had done prior shootings for the 4CHC gang with Ford.

3. Ford and Wright-Patterson Cannot Show Prejudice

As stated, to prove an ineffective assistance of counsel claim, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance resulted in prejudice; that is, there is a reasonable probability the defendant would have realized a more favorable result absence counsel's error. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 333.)

Neither Ford nor Wright-Patterson can show they were prejudiced by their counsels' failure to object to any of the other crimes or uncharged conduct evidence.

As discussed in section III. B., Ford's and Wright-Patterson's *Perkins* statements implicating themselves, each other, and Stewart in the McDaniel shooting, together with the evidence corroborating their statements, constituted overwhelming evidence of Ford's and Wright-Patterson's guilt of the murder and firearm possession charges (§§ 187/189, 29800), and the truth of the personal use enhancement against Ford (§ 12022.553, subds. (d), (e)). In light of the *Perkins* statements, and the other evidence we have previously discussed, there is no reasonable probability that any of the other crimes or uncharged conduct evidence affected the verdicts or true findings against Ford or Wright-Patterson.

D. *Substantial Evidence Supports Wright-Patterson's First Degree Murder Conviction*

Wright-Patterson and Stewart were tried as direct aiders and abettors to the first degree premeditated murder of McDaniel, while Ford was tried as the perpetrator of the murder. Wright-Patterson claims insufficient evidence supports his murder conviction because the record contains no evidence that he committed any " ' "affirmative action" ' " or "conduct" that directly aided and abetted Ford in perpetrating the murder. We disagree.

1. Legal Principles

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

66

defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Morales (*2020) 10 Cal.5th 76, 88.) We " 'presum[e] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944.)

A defendant charged as an aider and abettor to first degree murder may only be convicted "based on direct aiding and abetting principles." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) " '[T]he prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] . . . "[T]he accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' " ' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118.)[11]

---

[11] The jury was instructed on premeditated first degree murder and on direct aiding and abetting principles. (CALCRIM Nos. 400, 401, 521.) On aiding and abetting, the jury was instructed that, to prove a defendant guilty as an aider and abettor, the People must prove: (1) the perpetrator committed the crime, (2) the defendant knew the perpetrator intended to commit the crime, (3) before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime, and (4) "the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime." (CALCRIM No. 401.)

2.  Analysis

Wright-Patterson claims insufficient evidence shows that any of his "words or conduct did in fact aid and abet" Ford in perpetrating the McDaniel murder.  (CALCRIM No. 401.)  Wright-Patterson correctly points out that aiding and abetting liability " '*require*[*s*] *some affirmative action*' " that assists or encourages the perpetrator in committing the crime.  (*People v. Partee* (2020) 8 Cal.5th 860, 868.)  "[T]he test is whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged [the perpetrator] by words or gestures."  (*People v. Villa* (1957) 156 Cal.App.2d 128, 134.)

As Wright-Patterson acknowledges, in his *Perkins* statements, "Ford said he and two others, including a driver, went to the house where the NAW member was supposed to live; that Ford and the second guy both shot; that Ford later got caught with the .380 but he used the other gun to shoot McDaniel and the second guy shot the .380; and they got rid of the gun that fired the fatal shot."  Wright-Patterson points out, however, that, in his own *Perkins* statements, Wright-Patterson told the agent "*he did not shoot at the house, did not shoot at anyone, and did not kill anyone.  McDaniel was dead, shot in the neck by Ford, before Wright-Patterson began shooting in the air*."  (Italics added.)  Thus, Wright-Patterson claims there is "no evidence" he "encouraged Ford, verbally or otherwise, to shoot McDaniel" and "no physical evidence, no witness identification, and no other evidence connecting [him] to the offense."

We disagree with Wright-Patterson's view of the evidence.  Substantial evidence shows Wright-Patterson *encouraged* Ford to shoot and kill McDaniel in several ways:

68

(1) by going with Ford to McDaniel's house, by firing the .380 handgun "up in the air" after Ford shot McDaniel, and (2) by fleeing with Ford after the shooting. (*People v. Medina* (2009) 46 Cal.4th 913, 924 [factors suggesting aiding and abetting include presence at the scene, companionship, and conduct before and after the crime, including flight].) Under the circumstances known to Wright-Patterson, all of these actions "*did in fact aid and abet the perpetrator's commission of the crime.*" (CALCRIM NO. 401; *People v. Partee*, *supra*, 8 Cal.5th at p. 868.) Even if the jury believed that Wright-Patterson only shot his .380 handgun "up in the air" after Ford shot McDaniel, the jury could have reasonably concluded that Wright-Patterson directly aided and abetted Ford in shooting and killing McDaniel *by going with Ford* to McDaniel's house, arming himself, shooting his gun in the air, and fleeing the scene with Ford. Wright-Patterson's act of shooting the gun in the air after Ford shot McDaniel showed Wright-Patterson approved of the shooting and intended, by being there, to encourage Ford to commit the crime.[12]

---

[12] Wright Patterson suggests the ballistics evidence shows he *did not* shoot at McDaniel's house or at anything else because the shell casing found at the scene (four from the .380 handgun Wright-Patterson used, and one from the .45 handgun Ford used) were found *in the street in front* of McDaniel's house, not "near the front door or yard of the residence." We agree that the ballistics evidence did not conclusively show which gun or guns fired the shots that made the bullet strikes marks on McDaniel's house or on McDaniel's son's car. But as explained. it is immaterial whether Wright-Patterson only shot "in the air" after Ford shot McDaniel, because substantial evidence shows Wright-Patterson directly aided and abetted Ford in shooting McDaniel by going to the house with Ford, arming himself, shooting his gun after Ford shot McDaniel, and fleeing with Ford after the shooting.

E. *The Gang Enhancements Must Be Reversed*

The parties agree that the true findings on the gang enhancements (§ 186.22, subd. (b)) on defendants' first degree murder convictions must be reversed based on instructional error. We agree. The jury was not instructed on the elements of the gang enhancements (§ 186.22), as amended by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), effective January 1, 2022 (see Stats. 2021, ch. 699). Assembly Bill 333 applies retroactively to defendants' judgments. (*Tran*, *supra*, 13 Cal.5th at pp. 1206-1207.)

1. Assembly Bill 333

" 'In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.) to eradicate "criminal activity by street gangs." ' [Citation.] Among other things, the STEP Act created 'a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" (. . . § 186.22, subd. (b)(1)).' [Citation.]

"In 2021, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which became effective on January 1, 2022 (see Stats. 2021, ch. 699). Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subds. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333

70

requires that any such pattern have been '*collectively* engage[d] in' by members of the gang.  (§ 186.22, subd. (f), italics added.)  Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subds. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§186.22, subd. (g).)" (*Tran*, *supra*, 13 Cal.5th at pp. 1205-1206.)  Fifth, Assembly Bill 333 omitted certain nonviolent offenses from the list of offenses that can make up a gang's primary activities, and form the requisite pattern of criminal gang activity, "reducing the list of offenses from 33 to 26."  (*People v. Clark* (2024) 15 Cal.5th 743, 753.)  In addition, the new "collective engagement" element of a "criminal street gang"  (§ 186.22, subd (f)[13]) requires "a nexus" between the predicate offenses and the gang as a "collective enterprise."  (*Clark*, at p. 762.)

---

[13]  As amended by Assembly Bill 333, section 186.22, subdivision (f) defines a " 'criminal street gang' " as an "ongoing organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol,  and whose members *collectively engage* in, or have engaged in, a pattern of criminal gang activity."  (Italics added.)

71

## 2. Trial Court Proceedings

During jury selection in November 2021, the court and prosecutor agreed that Assembly Bill 333 applied retroactively to the gang enhancements in defendants' 2021 trial. The prosecutor asked the court to allow the People to try the case as though Assembly Bill 333 applied and said she would be "looking at the jury instruction to see what modifications are going to be required . . . ."

The jury was given a modified version of CALCRIM 1401, which incorrectly stated the elements of the gang enhancements under Assembly Bill 333. First, the instruction did not tell the jury that the charged offenses could not be used as predicate offenses to establish a "pattern of criminal gang activity." (§ 186.22, subd. (e)(1).) Second, the instruction erroneously stated that the predicate offenses that establish a pattern of criminal gang activity "need not be gang-related." The instruction did not inform the jury that the predicate offenses must have commonly benefited the gang "in a way that is more than reputational." (§ 186.22, subd.(e)(1); *People v. Tran*, *supra*, 13 Cal.5th at p. 1205.) Nor was the jury instructed that the "collective engagement" element of a "criminal street gang" (§ 186.22, subd (f)) requires "a nexus" between the predicate offenses and the gang as a "collective enterprise" (*People v. Clark*, *supra*, 15 Cal.5th at p. 762).

## 3. The People Concede the Gang Enhancements Must Be Reversed

The People concede that "[t]he record, particularly with respect to predicate offenses, the benefits to the gang, and whether members collectively engaged in a pattern of criminal activity under the newly amended statute, does not supply the additional proof

needed.  The prosecution presented little evidence about 4CHC's predicate offenses consistent with AB. 333."  "Due to the lack of factual detail presented at trial regarding the predicate offense," the People concede "it is not possible to conclude beyond a reasonable doubt the jury imposed the gang enhancements on a now legally valid ground."  "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges.  [Citations.]  . . .  Such a retrial is not barred by the double jeopardy clause or ex post facto principles. "  (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)  Thus, we remand the case to allow the People an opportunity to retry the gang allegations.

F.  *The Gang-Murder Special Circumstance Findings Must Also Be Reversed*

Under section 190.2, subdivision (a)(22), a person convicted of first degree murder is subject to the death penalty or life imprisonment without the possibility of parole if the jury finds "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of section 186.22, and the murder was carried out to further the activities of the criminal street gang."

Defendants claim the true findings on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)) must be reversed, along with the gang sentencing enhancements (§186.22, subd. (b)), because Assembly Bill 333's amendments to the definition of a criminal street gang (§ 186.22, subd. (f)) apply to section 190.2, subdivision (a)(22).  The People disagree.  They claim Assembly Bill 333's amendments to the definition of a criminal street gang cannot be applied to section 190.2, subdivision

73

(a)(22) without unconstitutionally amending proposition 21, a voter initiative statute that added the gang murder special circumstance to section 190.2.

After the People filed their respondents brief, our Supreme Court settled a split of authority on this question and held that "applying Assembly Bill 333's definition of 'criminal street gang' to the gang-murder special circumstance does not unconstitutionally amend section 190.2(a)(22)." (*People v. Rojas* (2023) 15 Cal.5th 561, 564, 579-580.) Of course, we are bound by the *Rojas* decision and follow it here. (*Auto Equity Sales*, *Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.)

The gang-murder special circumstance instruction, CALCRIM No. 736, used the erroneous definition of criminal street gang that was used in the gang enhancement instruction, CALCRIM No. 1401. Thus, the same prejudicial instructional error that affects the true findings on the gang enhancement allegations affects the true findings on the gang-murder special circumstance allegations. The remedy is to reverse the true findings on the gang enhancement and gang-murder special circumstance allegations, and remand the matter to allow the People an opportunity to retry the allegations. (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480.)

G. *The Motion to Bifurcate the Gang Allegations Was Properly Denied*

In addition to amending section 186.22, Assembly Bill 333 added section 1109 to the Penal Code effective January 1, 2022. (Stats. 2021, ch. 699, § 5). Section 1109 provides that, if requested by the defense, gang enhancement allegations (§186.22, subds. (b), (d)) must be tried separately from the charged offenses (§ 1109, subd. (a)).

74

During jury selection in November 2021, Stewart moved to bifurcate trial on the gang allegations (§186.22, subd. (b)) under section 1109, arguing the statute would apply retroactively to defendants' trial. Counsel also asked the court to bifurcate the gang-murder special circumstance allegations, in light of "the spirit of the changes of the law." Counsel acknowledged, however, that section 1109 does not apply to special circumstance allegations. The court denied the motion.

Defendants claim the trial court violated section 1109 and their due process right to a fair trial in denying their motion to bifurcate trial on the gang enhancement allegations from the charged offenses. They claim the error requires reversal and remand for a new trial on the charged offenses, with a separate new trial on the gang enhancement allegations.

There was no trial court error. The court was not required to bifurcate the gang enhancement allegations from the charged offenses, under section 1109, because the statute did not apply to defendants' trial. Resolving a split of authority in the Court of Appeal, our Supreme Court recently held that section 1109 does not apply retroactively to cases that were not yet final on its January 1, 2022 effective date. (*People v. Burgos* (2024) 16 Cal.5th 1, 29-30.) Defendants' trial concluded in December 2021, before section 1109 became effective on January 1, 2022. Because section 1109 does not apply retroactively to defendants' trial, the court did not err in denying the motion to bifurcate the gang allegations from the charged offenses under section 1109.

Defendants claim the court's refusal to bifurcate the gang allegations deprived them of their procedural due process rights because they had a fair expectation that

section 1109 would apply retroactively, and would require the court to bifurcate the gang allegations. They argue: "[W]hen state law gives a criminal defendant the expectation of receiving a certain right or benefit, the denial of that right may have the additional effect of violating the defendant's federal due process rights," citing *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [deprivation of state law right to jury determination of sentence violated the defendant's federal due process rights].) They claim that section 1109 gave them a "fair expectation" that the gang enhancement allegations would be tried separately; thus, they had a "liberty interest" in having the gang enhancement allegations tried separately. (See *Prieto v. Clarke* (4th Cir. 2015) 780 F.3d 245, 248.)

There is no merit to this claim. Because section 1109 was not in effect at the time of defendants' 2021 trial, and no court had determined that the statute applied retroactively, section 1109 could not have given defendants fair expectation that the gang enhancement allegations would be tried separately. Thus, defendants had no "liberty interest" in bifurcation, and the court's refusal to bifurcate the gang enhancement allegations did not violate defendants' procedural due process rights.

Defendants claim that the failure to bifurcate the gang enhancement allegations (§186.22, subd. (b)) from the charged offenses also violated defendants' due process rights to a fair trial, because the "gang evidence" rendered their trial on the charged offenses fundamentally unfair. We disagree. As we explain below in addressing defendants' challenges to the admission of the some of the gang evidence, none of the gang evidence rendered defendants' trial fundamentally unfair.

H. *Any Error in Admitting the Rap Music Video Evidence Was Harmless*

Defendants claim the trial court abused its discretion under sections 352 and 352.2 of the Evidence Code, and deprived defendants' of their due process right to a fair trial, in admitting portions of the *Warning* and *Beefin'* rap music videos. We conclude that any error in admitting the videos was not prejudicial under state or federal standards of reversible error, and that the admission of the videos did not render defendants' trial fundamentally unfair.

### 1. Relevant Background / Pretrial Proceedings

The prosecutor moved *in limine* to introduce the *Warning* and *Beefin'* rap music videos, by 4CHC gang member Pritchett. Ford appeared in the *Warning* video and Wright-Patterson appeared in the *Beefin'* video. Defendants did not rap in the videos, and no evidence showed defendants wrote any of the lyrics in the videos. In the *Warning* video, Pritchett rapped about shooting at houses, firearms, "Elsinore gang," selling drugs, having sex with other people's women, and getting "zipped in the body bag." Ford wore a baseball hat with an "M' logo, held a gun with a red laser on it, and displayed 4CHC gang hand signs. Scantily clad women are also depicted in the *Warning* video. In the *Beefin* video, Pritchett rapped about Lake Elsinore, having sex with "everybody['s]" women, murder, gangs, and firearms, with Wright-Patterson displaying 4CHC gang hand signs. Wright-Patterson is depicted in the *Beefin'* video in a park with Pritchett and other people.

At the hearing on the motion, the prosecutor argued Wright-Patterson's presence in the *Beefin'* video illustrated his association with and shared commitment to the 4CHC

gang's objectives. The prosecutor argued that the *Warning* video showing Ford holding a gun was relevant because, in his *Perkins* statements, Ford said the gun he used in the McDaniel shooting had a laser on it, and Ford told the agent how guns are traded and passed around within the 4CHC gang. Regarding the scantily-clad women in the *Warning* video, the prosecutor explained that Pritchett is a "pimp" and, in Ford's *Perkins* statements, Ford said he had loaned his gun to Wright-Patterson because Wright-Patterson gave his gun "to his big homie who came from Vegas and he's a pimp," referring to Pritchett.

Regarding the *Beefin*' video, the prosecutor explained: "So they're talking about their culture; they're talking about what the Four Corner Hustler Crips are about, and what they do, why they exist. So that is part of what my investigators are going to use to bolster their opinions. And as part of their opinions as to why they think the Four Corner Hustler Crips are a street gang under the new law, under the new definition . . ." The prosecutor later clarified that she was offering the videos to establish the gang's history and culture, not to show that the lyrics in the videos were true.

Stewart's counsel objected to the admission of the videos, arguing the videos had "minimal probative value" and were "highly inflammatory" in light of "the nature of rap music in today's popular culture" and "some of the racial connotations of it." (Evid. Code, § 352.) Although Stewart was not in the videos, Stewart's counsel argued the videos were cumulative of other evidence of Stewart's association with the 4CHC gang and "the nature of [4CHC] being a criminal street gang[.]" (*Ibid*.) Ford and Wright-Patterson joined Stewart's objections.

78

The trial court noted that "a lot" of the rap music video evidence was prejudicial, "especially the firearms and the language." The court ordered the People to redact portions of the *Warning* and *Beefin'* videos the court found 'highly prejudicial" but admitted other portions of the videos. The court also admitted 11 still photographs from a third rap music video titled *Ask About Me*, showing several 4CHC gang members. Defendants did not object to the admission of the 11 photographs.

2. Investigator Benjamin's Testimony About the Rap Music Videos

Investigator Benjamin testified that Pritchett was a 4CHC gang member and rapper who frequently produced and posted rap music videos on social media. Benjamin discovered Pritchett's rap music videos by searching Pritchett's gang moniker "T-Paper" on YouTube. Benjamin's opinion regarding Pritchett's gang status was partly based on the rap music videos Pritchett had created, showing himself and fellow gang members "constantly throwing up gang signs, wearing gang colors," and clothing with 4CHC logos. According to Benjamin, Pritchett was a "self-proclaimed "pimp." Benjamin also testified that Stewart was at Pritchett's house in Las Vegas when Stewart was arrested on the charges in this case in July 2018.

During Benjamin's testimony, the prosecutor played the edited versions of the *Warning* and *Beefin'* videos. The edited *Warning* video was one minute and 40 seconds long. Benjamin opined that the lyrics in the *Warning* video, " 'I cash out on Fours and all that,' " referred to 4CHC, and that the lyrics' references to "Lake Elsinore" and "Riverside Drive," signified where the 4CHC gang originated and its territory. The lyrics, " 'I ain't snitching, no shit, get your house smacked,' " was a warning that if a

79

person gave information to law enforcement, their house would be "shot up." Benjamin opined that "M" on Ford's baseball hat in the *Warning* video stood for "Murder Mafia," a 4CHC set or chapter with which Ford associated.

The edited *Beefin'* video was two minutes and 20 seconds long and showed Wright-Patterson in a park with fellow 4CHC members displaying gang hand signs. The lyrics in the video included several references to 4CHC and firearms. Investigator Benjamin opined that the lyrics, " 'Sliding through the murder, you know I got it on me,' " referred to Moreno Valley, where rival gangs to the 4CHC gangs were located.

### 3. The Admission of the Rap Music Videos Did Not Prejudice Defendants

Evidence Code section 352 gives trial courts discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court's decision to admit or exclude evidence under Evidence Code section 352 is reviewed for an abuse of discretion. (*People v. Dworak* (2021) 11 Cal.5th 881, 895.) An abuse of discretion occurs if the court's decision to admit or exclude evidence resulted in " ' a manifest miscarriage of justice' "; that is, the decision " ' " 'exceed[ed] the bounds of reason, all of the circumstances before it being considered' " ' " or was " ' "so irrational or arbitrary that no reasonable person could agree with it." ' " (*People v. Thomas* (2021) 63 Cal.App.5th 612, 626.)

" 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not

cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it." ' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964.)

But gang evidence is " ' "often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." ' " (*People v. Holmes*, *McClain and Newborn* (2022) 12 Cal.5th 719, 772.) "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun*, *supra*, 11 Cal.5th at p. 31.)

Assembly Bill No. 2799 (Stats. 2022-2023 Reg.Sess.) (Assembly Bill 2799) added section 352.2 to the Evidence Code, effective January 1, 2023. (Stats. 2022, ch. 973, § 2). In addition to the factors listed in Evidence Code section 352, Evidence Code section 352.2 requires trial courts to consider two specific factors in determining whether to admit evidence of "a form of creative expression" in a criminal proceeding: (1) the probative value of the expression "for its literal truth or as a truthful narrative," and (2) the possibility of undue prejudice, including that the expression will "inject racial bias

81

into the proceedings" and that the trier of fact will treat the expression as evidence of the defendant's propensity for violence or general criminal disposition. (Evid. Code, § 352.2, subd. (a).)[14]

In enacting Assembly Bill 2799, the Legislature found and declared that "[e]xisting precedent allows artists' creative expression to be admitted as evidence in criminal proceeding[s] without a sufficiently robust inquiry into whether such evidence introduces bias or prejudice into the proceedings. In particular, a substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence." (Stats. 2022, ch. 973, § 1, subd (a).) The Legislature also announced its "intent" that Evidence Code section 352.2 would "provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial

_____

[14] Evidence Code section 352.2 provides: "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).) As used in the statute, " 'creative expression' means the expression or application or creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media." (*Id*. at subd. (c).)

evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1, subd. (b).)

There is a split of authority in the Court of Appeal on whether Assembly Bill 2799 applies retroactively to cases on direct appeal on its January 1, 2023 effective date, and our Supreme Court is reviewing the question. (*People v. Slaton* (2023) 95 Cal.App.5th 363, 376, review granted Nov. 15, 2023, S282047 [§ 352.2 does not apply retroactively]; *People v Ramos* (2023) 90 Cal.App.5th 578, 596, review granted July 12, 2023, S280073 [same]; *People v. Venable* (2023) 88 Cal.App.5th 445, 456, review granted May 17, 2023, S279081 [§ 352.2 applies retroactively] (*Venable*).) In *Venable*, this court held that Evidence Code section 352.2 applies retroactively. (*Venable*, at p. 456.) Pending a contrary decision by our Supreme Court, we will follow *Venable* and assume that Evidence Code section 352.2 applies retroactively to defendants' cases, which were pending on appeal when the statute became effective on January 1, 2023. (Stats. 2022, ch. 973.)

The Governor signed Assembly Bill 2799 on September 30, 2022 (Stats. 2022, ch. 973), the year after defendants' trial concluded in December 2021. Thus, the trial court did not have the opportunity to consider the admissibility of the *Warning* and *Beefin'* videos under Evidence Code section 352.2. Even if, however, the trial court abused its discretion in admitting the videos under either Evidence Code sections 352 or 352.2, the videos did not prejudice the verdicts on the charged offenses or the true finding on Ford's firearm enhancement, under the state and federal standard of reversible error.

83

The erroneous admission of evidence under state law is reversible if the defendant shows there is a reasonable probability the defendant would have realized a more favorable result had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under the federal standard of reversible error, the burden is on the People to show the error was harmless beyond a reasonable doubt. (*Chapman v. Cal.* (1967) 386 U.S. 18, 36.) The People must show there is no " 'reasonable possibility' " the error affected the outcome. (See *People v. Watson* (2008) 43 Cal.4th 652, 693.)

Defendants claim the federal standard applies because the *Warning* and *Beefin*' videos were so prejudicial they rendered defendants' trial "fundamentally unfair" in violation of their federal due process rights to a fair trial. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "Although there is no single test for such 'fundamental unfairness,' . . . only acts that 'undermine[] confidence in the outcome of the trial' rise to the level of due process violations." (*People v. Albarran, supra,* 149 Cal.App.4th at p. 239 (dis. opn. Perluss, P.J.).) The admission of the *Warning* and *Beefin'* videos did not render defendant's trial fundamentally unfair. For several reasons, there is no reasonable probability, or reasonable possibility, that the videos affected the outcome of the trial.

First, the court instructed the jury it could "consider evidence of gang activity only for the limited purpose of deciding whether . . . [t]he defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes, enhancements, and special circumstance allegations charged" and whether "[t]he

84

defendant had a motive to commit the crimes charged." The jury was instructed it could not consider evidence of gang activity for any other purpose, including that a defendant was "a person of bad character" or had "a disposition to commit crime." (*Ibid.*) The jury was also instructed that it must not be biased in favor of or against any defendant based on the defendant's "race or ethnicity." Absent a contrary showing, and there is none here, we presume the jury followed these instructions. (*People v. Williams* (2009) 170 Cal.App.4th 587, 613.)

Second, any prejudice from the *Warning* and *Beefin'* videos was minimized because the videos were brief and played a minor role in the prosecution's case. The jury heard testimony about gangs and gang violence for over two weeks, from November 29 to December 17, 2021. As noted, the edited *Warning* video was one minute forty seconds long, and the edited *Beefin'* video was two minutes twenty seconds long. Ford and Wright-Patterson played minor roles in the videos; they did not rap in the videos, and there was no evidence that they or Stewart, who did not appear in the videos, wrote any of the lyrics in the videos. The lyrics and other artistic content of the videos was attributed to Pritchett, whom Investigator Benjamin testified was a rapper, 4CHC gang member, and "self-proclaimed 'pimp' " who was "always posting videos on social media."

Third, based on the entire record, the *Warning* and *Beefin'* videos could not have influenced the jury's decision to convict defendants of the murder and unlawful firearm possession charges, and to find the firearm allegation true against Ford. As discussed, the admissible evidence of defendants' guilt was overwhelming. Ford's and Wright-

85

Patterson's *Perkins* statements, implicating themselves as the shooters and Stewart as the driver in the McDaniel shooting, was corroborated by the ballistics evidence, the crime scene evidence, and Ford's social media postings. This evidence unequivocally showed that defendants premeditated the McDaniel shooting to retaliate against the NAW gang for the Lawton shooting, and T.P.'s testimony showed Stewart possessed a firearm at the time of the McDaniel murder. In sum, in light of the entire record, the *Warning* and *Beefin'* videos did not render defendants' trial fundamentally unfair, and their admission could not have affected any of the jury's verdicts or true findings.

I. *Defendants' Challenges to Other Gang-Related Evidence Lack Merit*

    1. Ford's Gang-Related Tattoos

Ford claims the trial court prejudicially erred in overruling Ford's objection to the evidence of Ford's gang-related tattoos because the tattoo evidence was cumulative to other evidence that Ford was a 4CHC member. (Evid. Code, § 352.) Ford also claims the prosecutor's use of the tattoo evidence rendered his trial fundamentally unfair. We disagree with both claims. During trial, a correctional deputy testified that Ford had tattoos on his neck and hands. Later, Officer Kyle Hernandez, who had worked on the Riverside County Gang Task Force from 2015 to 2020, testified that during a 2018 contact with Ford, he observed Ford's gang-related tattoos, including the number "4" on the left side of Ford's face, symbolizing the Four Corners, a Washington Nationals symbol on his hand, symbolizing the he was from an Inland Empire gang, and a crossed-out muffin on his hand, symbolizing disrespect to a rival gang. In addition, Investigator Benjamin based his opinion that Ford was a 4CHC gang member in part on Ford's gang-

86

related tattoos.  Benjamin explained that, to obtain a gang-related tattoo, "you have to put in work," "do things that benefit the gang," and "earn that tattoo."  The prosecutor also introduced four booking photographs showing 4CHC tattoos on Ford's face, neck, and hands.

Ford concedes that the tattoo evidence was "plainly relevant to show [his] membership" in the 4CHC gang.  Ford argues, however, that "this point was not in dispute and jurors heard substantial evidence of [his] membership," including his "multiple admissions to police that he was in the gang, his statement to the informant and admissions on his own [social media] page."  Thus, Ford claims the tattoo evidence should have been excluded as cumulative.  (Evid. Code, § 352.)

But the tattoo evidence was not cumulative.  More than Ford's verbal admissions of gang membership, Ford's tattoos symbolized Ford's commitment to the 4CHC gang, and that Ford had "put in work" for the gang.  The tattoo evidence showed Ford had 4CHC tattoos both before and after the McDaniel murder, indicating Ford was an active participant in the 4CHC gang at the time of the murder.  (§ 190.2, subd. (a)(22).)  Thus, the tattoo evidence was more probative of Ford's 4CHC gang membership and active participation than Ford's verbal admissions of membership standing alone.  "Evidence that is identical in subject matter to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value."  (*People v. Mattson* (1990) 50 Cal.3d 826, 871, disapproved on another ground in *People v. Bolin, supra,* 18 Cal.4th at p. 315.)  Thus, the trial court did not abuse its discretion in admitting the tattoo evidence.

Nor did the admission of the tattoo evidence result in a due process violation. " 'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. [Citation.] "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' " ' " (*People v. Coneal*, *supra*, 41 Cal.App.5th at p. 972.) As Ford's concedes, the tattoo evidence was "plainly relevant" to show Ford's gang membership—a permissible inference the jury could have drawn from the evidence. Further, the tattoo evidence was not of such quality that it necessarily prevented a fair trial. (*Ibid*.; *People v. Valdez* (2012) 55 Cal.4th 82, 134 [because gang-related evidence was relevant to material issues and not unduly prejudicial, its admission did not violate the defendant's due process right to a fair trial].)

2. Ford's October 2018 In-Custody Fight With a NAW Gang Member

Ford also claims the trial court prejudicially erred in admitting the evidence that, while in local custody in 2018, Ford started a fight with a fellow jail inmate, a NAW gang member, together with Ford's statements to officers about why Ford started the fight. We conclude the trial court did not abuse its discretion in allowing the evidence. The evidence was relevant to show Ford's motive and intent in committing the charged murder of McDaniel, and any potential improper use of the evidence or prejudice was mitigated by the jury instructions.

(a) *Background*

A correction deputy who worked in the Riverside County jail testified that, on October 30, 2018, he saw Ford and another inmate fighting. The deputy reviewed a

video and confirmed that Ford "swung first" and started the fight. In an interview, Ford told the deputy he started the fight due to "street gang issues" and because his hand had been injured in a previous fight. Ford also told the deputy that he used a "soap sack, made out of inmate socks with a bar [of] soap at the end" and that he "like[d] to fight." In a later interview, Ford told another officer he started the fight because the inmate was a NAW gang member and, when 4CHC gang members come into contact with NAW gang members, they assault them. Ford explained that, if he had not started the fight, "word would have spread" to other gang member inmates that Ford did not fight the inmate, and Ford did not want to look like a "punk."

The jury was instructed that it could consider "evidence of other behavior by the defendants that was not charged in this case" only if the People proved by a preponderance of the evidence that the defendant "in fact committed the uncharged acts," and then, only in determining whether (1) the defendant was the person who committed the charged offenses, and (2) the defendant "acted with intent to kill" and had "a motive" and "a plan" to commit the charged offenses. The jury was also instructed that it could not consider uncharged acts evidence for any other purpose, including to infer that the defendant was a person of bad character or was disposed to commit crimes.

(b) *Analysis*

Other crimes evidence is admissible " 'when relevant to prove some fact' " such as the defendant's motive or intent in committing the charged crime. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381; Evid. Code, § 1101, subd. (b).) Other crimes evidence is admissible to prove intent " 'only if the charged and uncharged crimes are

89

sufficiently similar to support a rational inference of . . . intent.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewolt* (1994) 7 Cal.4th 380, 402.) Similarly, other crimes evidence is admissible to show motive when " '[b]oth crimes are explainable as a result of the same motive.' " (*Spector*, at p. 1381, italics omitted; see *People v. Demetrulias* (2006) 39 Cal.4th 1, 15.) "When reviewing the admission of other crimes evidence to show motive, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crimes evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion." (*People v. Johnson* (2015) 12 Cal.5th 544, 610.) We review a trial court's rulings on the relevance and the admission or exclusion of evidence for an abuse of discretion. (*Ibid*.)

Ford concedes that the evidence of the in-custody fight, and Ford's explanation for starting the fight, was "relevant to show the rivalry between the NAW and [4CHC] gangs," and "supported the state's theory as to the motive for the charged crime." Ford claims, however, that the evidence was cumulative because the "jurors already heard" extensive evidence that defendants committed the McDaniel shooting to retaliate against the NAW gang for the Lawton shooting. Ford points out that the jury "already heard" (1) Ford's and Wright-Patterson's *Perkins* statements that McDaniel's son was a NAW gang member, (2) Investigator Benjamin's opinion that defendants committed the murder

to retaliate against the NAW gang for the Lawton shooting, and (3) Ford's social media posts indicating that the 4CHC gang should retaliate for the Lawton shooting.

The trial court reasonably determined that the in-custody fight evidence was not cumulative to the other proffered evidence of Ford's motive and intent in committing the McDaniel shooting. First, the in-custody fight evidence was sufficiently similar to the charged murder to support a rational inference that Ford had the same motive and intent in starting the fight as he had in committing the murder: to retaliate against the NAW gang. And, unlike the other evidence of Ford's motive and intent, the in-custody fight evidence showed Ford had in fact retaliated against NAW gang members based solely on the rivalry between the 4CHC and NAW gangs. (*People v. Mattson*, *supra*, 50 Cal.3d at p. 871 [evidence is not cumulative when it has greater evidentiary weight or probative value than other evidence adduced on the same subject matter].)

The court also reasonably determined that the in-custody fight evidence was not unduly prejudicial. Although the risk of prejudice is "inherent" whenever other crimes evidence is admitted, the risk is not "unusually grave" or *unduly* prejudicial when, as here, the other crimes are not "significantly more inflammatory" than the charged crimes, the evidence that the defendant committed both crimes is compelling, and the jury was correctly instructed on the purposes for which it could use the other crimes evidence. (*People v. Kipp* (1988) 18 Cal.4th 349, 372.) For the same reasons, the evidence did not violate defendants' due process right to a fair trial. (*People v. Catlin*, *supra*, 26 Cal.4th 81, 122-123 [other crimes evidence relevant to show facts other than criminal propensity does not violate due process right to fair trial].)

91

3. The Eleven Still Images From the *Ask About Me* Rap Music Video

Ford claims his counsel rendered ineffective assistance in failing to object to the admission of the 11 still images from the *Ask About Me* rap music video. As Ford points out, there was no pretrial discussion of this evidence, and the prosecutor introduced the 11 still images through Investigator Benjamin.

One of the images showed several 4CHC members together, including Pritchett. Another image showed 4CHC members Eric Taylor and Brandon Lawton together, and a third image showed a "close-up" of Eric Taylor holding a gun. The other images included other 4CHC gang members.

Ford argues that the images of Taylor and Lawton were cumulative to (1) evidence that Taylor committed a predicate offense, and (2) that defendants were motivated to commit the McDaniel shooting to retaliate for the Lawton shooting. (Evid. Code, § 352.) Ford argues the other images were "simply not relevant to Ford" because some of the individuals in the still images were not 4CHC members, and none of the individuals in the images, except Taylor, allegedly committed a predicate offense. (Evid. Code, §§ 210 [only relevant evidence is admissible].)

Ford's ineffective assistance claim fails because Ford has not shown he was prejudiced by his counsel's failure to object to the admission of the still photos. (*People v. Kaihea* (2021) 70 Cal.App.5th 257, 267-268 ["To establish ineffective assistance of counsel, a defendant must establish that he was prejudiced."].) There is no reasonable probability that Ford, Stewart, or Wright-Patterson would have realized a more favorable result had the still photos evidence not been admitted. (*Strickland v. Washington*, *supra*,

92

466 U.S. at pp. 693-694.)  The still photos, and Investigator Benjamin's testimony about the individuals in them, was a brief and minor part of the prosecution's case.  Moreover, defendants were not in any of the still photos, no evidence showed any defendant was in the *Ask About Me* video, and, apart from the still photos, no evidence was presented of the content of the *Ask About Me* video.

J.  *There Is No Cumulative Trial Error*

Defendants claim the cumulative effect of the trial errors requires reversal of the judgments.  (*People v. Hill* (1998) 17 Cal.4th 800, 844-848.)  We have assumed four trial errors that resulted in the admission of the following evidence (1) the holding cell recordings, insofar as they were admitted against Ford and Wright-Patterson (Section III.B.); (2) that each defendant committed crimes or engaged in criminal conduct other than the charged offenses (Section III.C.) with the exception of Ford's in-custody fight with the NAW gang member (Section III.J.); (3) the *Warning* and *Beefin'* videos (Section III.I.); and (4) the 11 still photos from the *Ask About Me* rap music video (Section III.I.)  The assumed errors that resulted in the admission of this evidence were neither individually nor cumulatively prejudicial.  (*People v. Williams* (2015) 61 Cal.4th 1244, 1291.)

As discussed, the admissible evidence of defendants' guilt of the charged offenses and the truth of Ford's firearm enhancement was overwhelming.  Ford's and Wright-Patterson's *Perkins* statements admitting defendants committed the McDaniel shooting in retaliation for the Lawton shooting were corroborated by the ballistics and crime scene evidence, Ford's social media postings, and the circumstantial evidence that defendants

93

were active 4CHC gang members at the time of the McDaniel shooting. In light of this evidence, the holding cell recordings, the evidence of defendants' other crimes and criminal conduct, the *Warning* and *Beefin'* videos, and the 11 still photos from the *Ask About Me* video could not have affected the guilty verdicts on the charged offenses or the true finding on Ford's firearm enhancement. (See *People v. Martinez* (2003) 31 Cal.4th 673, 696 ["testimony regarding defendant's relatively minor infractions could not have affected the jury's penalty verdict"].) Further, none of the holding cell recordings, other crimes, rap music, or still photo evidence undermined T.P.'s testimony that she saw Stewart shooting a firearm in the McDaniel shooting, which supports Stewart's conviction in count 2 for unlawfully possessing a firearm at the time of the shooting.

K. *Defendants Have Not Demonstrated an Racial Justice Act Violation*

Defendants claim the judgments must be reversed because the People obtained their convictions based on racial bias, in violation of the Racial Justice Act of 2020 (Stats. 2020, ch. 317) (the RJA), and defendants' equal protection and due process rights. Defendants claim the RJA was violated in two respects: (1) the prosecutor and law enforcement officers exhibited racial bias toward defendants by "rel[ying] on evidence obtained through the implementation of [the] racially biased *Perkins* operation[s]" (§ 745, subd (a)(1)); and (2) the prosecutor "introduced and used racially incendiary or coded language—repeated use of the n-word, slang associated with the Black community, rap videos and lyrics—. . . thus dehumanizing the defendants by evoking prejudicial stereotypes of Black men." (§ 745, subd. (a)(2).) If these claims are deemed forfeited for

94

failing to raise them in the trial court, defendants claim their counsel were ineffective in failing to raise the claims.

The People claim defendants forfeited their RJA claims by failing to raise them in the trial court, and defendants cannot show their counsels' performance was ineffective for failing to raise the claims. As we explain, even if the RJA claims are forfeited, defendants cannot show, on this record, that their counsel rendered ineffective assistance in failing to raise the RJA claims. Moreover, on this trial record, defendants have not established an RJA violation.

1. Legal Framework

The RJA was originally enacted effective January 1, 2021 and is codified in three interrelated Penal Code statutes. (§§ 745, 1473, subd. (f), 1437.7, subd. (a)(3); Stats. 2020, ch. 317, §§ 3-5; see *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147.) In enacting the RJA, our Legislature found and declared: "Discrimination in our criminal justice system based on race, ethnicity, or national origin (hereinafter 'race' or 'racial bias') has a deleterious effect not only on individual criminal defendants but on our system of justice as a whole[,]" "undermines public confidence in the fairness of the state's system of justice[,] and deprives Californians of equal justice under law." (Stats 2020, ch. 317, § 2, subd. (a).) The Legislature further found that, while racial bias is "widely acknowledged as intolerable in our criminal justice system," it persists because "courts generally only address racial bias in its most extreme and blatant forms." (*Id*. at subd. (c).) "Even when racism clearly infects a criminal proceeding, under current legal precedent, proof of purposeful discrimination is often required, but nearly impossible to

95

establish." (*Ibid.*) "Existing precedent tolerates the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials." (*Id*. at subd. (e).)

Thus, the Legislature enacted the RJA with the intent to "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Stats. 2020, ch. 317; § 2, subd. (i); see *Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 123.) To accomplish this goal, the RJA provides: "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) An RJA violation is "established" if a defendant proves by a preponderance of the evidence that any one of four categories of conduct occurred. (§ 745, subd. (a)(1)-(4); *People v. Coleman* (2024) 98 Cal.App.5th 709, 719 (*Coleman*).)

Defendants' RJA claims are based on two of these four categories of conduct: (1) "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror *exhibited bias or animus towards the defendant* because of the defendant's race, ethnicity, or national origin" (§ 745, subd. (a)(1), italics added), and (2) "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, *used racially discriminatory language* about the defendant's race, ethnicity, or national origin, or *otherwise exhibited bias or animus* towards the defendant because of the defendant's race, ethnicity, or national origin, *whether or not purposeful*. This paragraph does not apply if the person speaking is relating language used by another that

96

is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2), italics added.)

2. The Forfeiture Question

Before we address the merits of defendants' RJA claims, we consider the People's claim that defendants have forfeited their RJA claims by failing to raise them in the trial court. At the time of defendants trial in 2021, section 745 subdivision (b) provided that a defendant could seek relief under the RJA: (1) by filing a motion in the trial court, or, if judgment had been imposed, (2) by filing a petition for a writ of habeas corpus or (3) a motion under section 1473.7 in a court of competent jurisdiction. (§ 745, former subd. (b); enacted by Stats 2020, ch. 317, § 3.)

Effective January 1, 2023, section 745 was amended to provide for its retroactive application to judgments not final on its January 1, 2021 effective date. (§ 745, subd. (j)(1); Stats. 2022, ch. 739, § 2.) In the same legislation, section 745, subdivision (c) was amended to provide that, "[a] motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation. A motion that is not timely may be deemed waived, in the discretion of the court." (Stats. 2022, ch. 739, § 2.)

Effective January 1, 2024, Assembly Bill No. 1118 (Reg. Sess. 2023-2024) (Assembly Bill 1118) amended section 745, subdivision (b) to allow an RJA claim "based on the trial record" to be raised "on direct appeal." (§ 745, subd. (b).) Section 745, subdivision (b) now provides: "A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.3, in a court of competent jurisdiction, alleging a violation of subdivision (a). *For claims based*

97

*on the trial record, a defendant may raise a claim alleging a violation of subdivision (a)*
*on direct appeal from the conviction or sentence*.  The defendant may also move to stay
the appeal and request remand to the superior court to file a motion pursuant to this
section."  (§ 745, subd. (b), as amended by Stats. 2023, ch. 464, § 1, eff. Jan. 1, 2024,
italics added; see *Coleman*, *supra*, 98 Cal.App.5th at p. 720.)

Defendants argue Assembly Bill 1118 "makes clear that claims based on the trial
record may be raised *without objection* for the first time on appeal."  (Italics added.)  The
People claim defendants forfeited their RJA claims by failing to raise them by one of the
three means available to them during and after trial under former subdivision (b) of
section 745.  Thus, the issue presented is whether Assembly Bill 1118 allows an RJA
claim that is "based on the trial record" to be raised *for the first time* on appeal.  (§ 745,
subd. (b).)  After the parties filed their briefs in this appeal, the court in *People v. Lashon*
(2024) 98 Cal.App.5th 804 (*Lashon*), review denied April 17, 2024, S283852, held that
Assembly Bill 1118 did not "obviate the general forfeiture rules," or preclude courts from
finding an RJA claim forfeited if the claim could have been raised, but was not raised,  in
the trial court.  (*Lashon*, at pp. 811, 814-818.)

*Lashon* reasoned that amended section 745, subdivision (b) does not state that an
RJA claim based on the trial record may be raised "for the first time" on direct appeal,
and the court saw "no compelling reason to add words to the statute," given that its
legislative history did not "evince an intent . . . to strip the courts of their discretionary
authority to determine whether a section 745 claim is reviewable on direct appeal where
the claim could have been but was not presented in the trial court."  (*Lashon*, *supra*,

98 Cal. App.5th at pp. 812, 814-815.) *Lashon* explained: "It makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions [(§745, subd. (c))]), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue a section 745 claim for the first time on direct appeal." (*Lashon*, at p. 813.) Thus, the *Lashon* court held: "a defendant may be found to have forfeited a section 745 claim of racial bias made for the first time on direct appeal in the absence of a showing that an exception to the forfeiture doctrine applies." (*Lashon*, at p. 815.)

Shortly before *Lashon* was decided, the court in *Coleman* declined to decide "whether Assembly Bill No. 1118's amendments to section 745 *excuse forfeiture*[,]" that is, whether an RJA claim "based on the trial record" can be raised *for the first time* on direct appeal. (*Coleman*, *supra*, 98 Cal.App.5th at p. 720, italics added; § 745, subd. (b).) Instead, *Coleman* exercised its discretion to consider the merits of the RJA claim and found no RJA violation was shown based on the trial record. (*Id*. at pp. 720-723.)

Similarly here, we decline to decide whether defendants forfeited their RJA claims by failing to raise them in the trial court in the first instance. (*Coleman*, *supra*, 98 Cal.App.5th at p. 720.) As we explain, if the RJA claims are not forfeited, defendants have not established an RJA violation "based on the trial record." (§ 745, subd. (b).) And if the RJA claims are forfeited, defendants cannot show, on this trial record, that their counsel were ineffective in failing to raise the RJA claims in the trial court.

3. No RJA Violations Are Shown on the Trial Record

Defendants claim "implicit and systemic bias against Black men" affected the proceedings and the outcome of defendants' trial. As noted, defendants raise two RJA claims for the first time in this appeal. We turn to the first claim.

(a) *Alleged Racial Bias in the* Perkins *Operations*

Defendants first claim the prosecutor and law enforcement officers "exhibited [racial] bias" toward them by "rel[ying] on evidence obtained through [the] implementation of [the] racially biased *Perkins* operation[s]." (See § 745, subd (a)(1).) But there is no showing in the trial record that the *Perkins* operations were racially biased, or that the People's reliance on the *Perkins* statements obtained through the *Perkins* operations exhibited "racial bias." (§ 745, subds. (a)(1), (b).)

(i) *Background*

The trial record shows Investigator Johnson and other law enforcement officers used the *Perkins* operations to obtain statements about the McDaniel shooting from Ford and Wright-Patterson, while Ford and Wright-Patterson were in custody and before they had been charged in the McDaniel shooting. In moving *in limine* to admit the *Perkins* statements as statements against interest (Evid. Code, § 1230), the prosecutor told the court how the *Perkins* operations were implemented.

The prosecutor explained that the agents,[15] who were placed in the cells with Ford and Wright-Patterson, were "made to look like inmates" They were dressed in orange,

_____

[15] The record shows the same agent was used in the *Perkins* operations with Ford and Wright-Patterson. See footnote 4, *ante*.

100

they had booking prints and "booking bands on them," and "a backstory that they're in there for some sort of crime." While in the cell, "the agents start talking . . . to our target, basically building up a rapport. [¶] At some point, law enforcement will come in and speak to the target, and let [the target] know that they're part of the homicide team, and that they're there to talk about the homicide that they know [the target has] committed, and they give [the target] a little set of facts, such that the agent or agents in the cell can start talking to the target about that crime."

In opposing the motion, counsel for Stewart described the *Perkins* agents as "sophisticated agents" who employed "systematic" and "very specific tactics to people in very vulnerable states." Counsel noted Ford and Wright-Patterson were "young African American men who [were] placed in a cell with older African American gentlemen who appeal to that sense of, you know, age and advice, to very vulnerable individuals in that context." Counsel argued, "the systematic way in which the district attorney's office, in coordination with the sheriff's department, in conducting *Perkins* operations in homicide cases[,] violate[d] the spirit . . . of *Illinois v. Perkins* . . . ." More specifically, counsel claimed that the way the *Perkins* operations were conducted—they targeted young Black men—undermined the voluntariness of *Perkins* statements obtained in the operations and "systematically undermine[d] the *Miranda* and Sixth Amendment rights of homicide suspects." Counsel argued the *Perkins* operations also raised "general due process" and equal protection concerns.

Counsel for Wright-Patterson expanded on Stewart's equal protection claim. Counsel said: "There are things with the previous cases that I've had that have had

101

*Perkins* issues in them, they have all related to African American men, African American clients and agents. And there's that cultural age gap between a then under 20-year-old client and a 40-year-old agent. And the dynamic that takes place with trying to appeal to an older male figure in anticipation of possibly being incarcerated with older male figures, not having done that type of time before, there's a braggadocio that's elicited that comes through . . . . [¶] *And of all the inquiries that I've made of my colleagues, I have not had one instance where I've been told that Perkins has been applied to non-African Americans or non-Hispanic Latino X.*"

In response to counsels' arguments, the prosecutor denied that "we're targeting Blacks with *Perkins* operations." Regarding the racial makeup of the individual targets of the *Perkins* operations, the prosecutor invoked the public agency privilege not to disclose "official information" (Evid. Code, § 1040) but offered to "speak to the court in camera and disclose further information."

(ii) *Analysis*

Defendants argue that, under section 745, subdivision (d), which allows discovery on RJA claims upon a showing of good cause,[16] "Wright-Patterson's proffer of racial bias was sufficient to procure a disclosure from the prosecutor as to how many times

---

[16] Section 745, subdivision (d), provides: "A defendant may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state. A motion filed under this section shall describe the type of records or information the defendant seeks. Upon a showing of good cause, the court shall order the records to be released. Upon a showing of good cause, and in order to protect a privacy right or privilege, the court may permit the prosecution to redact information prior to disclosure."

Riverside County's *Perkins* operation was implemented against Black men compared to other racial groups." Defendants point out that, " '[i]n order to establish good cause for discovery under the [RJA], a defendant is required only to advance a plausible factual foundation, based on specific facts, that a violation of the [RJA] "could or might have occurred" in his case.' " (*Young v. Superior Court*, *supra*, 79 Cal.App.5th at p. 159.) Thus, defendants argue that Wright Patterson "was entitled to disclosure of statistical information refuting or confirming [his counsel's] allegation, followed by an evidentiary hearing (§ 745, subd. (c)), to determine the merits of the [RJA] claim."

But it is immaterial whether Wright-Patterson's "proffer of racial bias" advanced a plausible factual foundation that an RJA violation may have occurred in the *Perkins* operations, or showed good cause to discover "how many times Riverside County's *Perkins* operations was implemented against Black men compared to other racial groups." Regardless of whether "statistical information" or other evidence confirming or refuting Wright-Patterson's "proffer of racial bias" was discoverable in a proceeding to adjudicate an RJA violation (§ 745, subd. (d)), defendants never sought this evidence through discovery because they did not file a motion in the trial court alleging an RJA violation based on the *Perkins* operations (§ 745, subd. (b)). Thus, the statistical information that defendants claim would show that the county's *Perkins* operations targeted young Black men, is simply not in the trial record.

Further, defendants point to no evidence in the trial record establishing that the county's *Perkins* operations were racially biased either because they were disproportionately implemented against Black men as compared to other racial groups, or

103

for any other reason. Thus, there is *no evidence* to support defendants' claim that the prosecutor and law enforcement officers "exhibited racial bias" toward defendants by "relying" on evidence, namely, the *Perkins* statements, obtained through "the implementation" of the *Perkins* operations. (§ 745, subds. (a)(1), (2).) Defendants' "general due process" and equal protection claims are likewise unsupported by the trial record.

(b) *The N-Word, Other Racially Biased Language and Stereotypes*

Defendants claim the prosecutor "used racially discriminatory language" and "otherwise exhibited bias or animus" toward defendants based on their race, in violation of section 745, subdivision (a)(2). Defendants specifically claim that, during trial, the prosecutor "introduced and used racially incendiary or coded language—repeated use of the n-word, slang associated with the Black community, rap videos and lyrics—. . . thus dehumanizing . . . defendants by evoking prejudicial stereotypes of Black men."

As noted, under subdivision (a)(2) of section 745, an RJA violation "is established if the defendant proves, by a preponderance of the evidence" that, "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, *used racially discriminatory language* about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) The statute limits its application: "This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is

104

giving a racially neutral and unbiased physical description of the suspect." (*Ibid*)  As used in section 745, " 'racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin.  Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."  (§ 745, subd (h)(4).)

Defendants argue the prosecutor used racially discriminatory language and otherwise exhibited racial bias or animus toward defendants in four respects, namely, by her uses of (1) the n-word, (2) slang terms, (3) dehumanizing terms, and (4) the *Warning* and *Beefin'* rap music videos.  We address these claims in turn.

*Use of the N-Word and Slang Terms*:  Defendants claim the prosecutor exhibited "implicit racial bias" or animus toward defendants by her "repeated use of the n-word" during trial.  (§ 745, subd. (a)(2).)  They claim the prosecutor "repeatedly used the n-word during direct examination," witnesses also used the n-word in answering the prosecution's questions, and in closing arguments the prosecutor used the n-word "approximately 18 times."  They claim that these uses of the n-word "triggered implicit bias in the jury" by " 'priming' " the jury to form "negative judgments" about defendants based on their race, or "outgroup bias."

105

Defendants also note that "[t]he prosecutor repeatedly resorted to using slang terms, such as 'baby mama,' common in [African-American Vernacular English or] AAVE," and "mimicked statements made by the defendants in AAVE." They complain that the prosecutor had "multiple different phrases she could have used to communicate her point," but "she intentionally *chose to repeat slang words and directly quote the defendants*, tapping into a prevailing attitude that AAVE is 'a less-than complete language,' and 'error-riddled,' the 'lax pronunciation' and aggressiveness of which is attributed to the laziness and physical aggression of its speakers."

As the People point out, Ford, Wright-Patterson, and others used the n-word in many statements relevant to the case. The n-word appears more than 150 times in the *Perkins* statements alone. Ford used the slang term "baby mama" to refer to the mother of his child in explaining to the *Perkins* agent why he had been charged with two attempted murders. Ford, Wright-Patterson, and others also used the slang terms "homie" and "big homie" in referring to various gang members.

We have examined the entire trial record and have found no instance in which the prosecutor or a witness used the n-word or a slang term, including "baby mama" or "homie," when that person was not quoting or paraphrasing someone who had used the term in a statement relevant to the case. Section 745, subdivision (a)(2), does not apply "if the person speaking is relating language used by another that is relevant to the case" (§ 745, subd. (a)(2).) This limitation on the operation of the statute applies here.

We have also found no instance in which the prosecutor or a witness used the n-word or a slang term in a gratuitous or mocking manner, or in any other way that

exhibited a racial bias or animus toward any of defendants.  (§ 745 subd. (a)(2).)  For example, when the prosecutor quoted the agent using the n-word and "homies" in the *Perkins* operation with Wright-Patterson, she was arguing the agent was not manipulating Wright-Patterson or Ford, and that the jury should believe Ford's and Wright-Patterson *Perkins* statements.  In sum, during the entire trial, the n-word and slang terms were not used in a way that would "prime" the jury for racial bias.  Thus, defendants have not established an RJA violation based on the prosecutor's and witnesses' uses of the n-word and slang terms.

*Dehumanizing Terms or References*:  Defendants claim the prosecutor "further dehumanized" them and exhibited racial bias toward them by (1) referring to them "primarily" by their gang names, and (2) "directly appeal[ing] to the jury's sense that the defendants were a different breed or group of people, cold-hearted and violent predators." Defendants argue the prosecutor painted them as a "different breed" by using the phrases "normal people" and "hunting" in her closing argument.

The prosecutor told the jury:  "Why did I spend time proving those things up? Because I understand that as *normal people* who are law-abiding and go about their day, that go to work, that take care of their families, that you would have a really hard time believing the things that these men said in their statement.  Who is going to believe it, right?  . . .  [¶]  I knew you guys would have a hard time believing it.  So I had to show you that you shouldn't have any doubt about what they were admitting and what they were telling you.  You have had an opportunity to get to know who these three men are, to know what's important to them, to know what they do.  And one thing is for certain,

107

they have very little, if any, respect for human life." Thereafter, in arguing the McDaniel murder was deliberate, the prosecutor said, "They knew the consequences and they decided to kill. And we know before these three even got in that car, they were armed and *they were hunting. That was their entire purpose. They were hunting for NAW gang members*, didn't matter which." (Italics added.) "And sure enough, remember, Menace [Lawton] was the whole reason that they went *hunting* that night to retaliate against NAW." (Italics added.)

In sum, defendants claim the prosecutor "dehumanized" them by "primarily" referring to them by their gang names, by suggesting they were not "normal people," and by saying they were "hunting" when they murdered McDaniel. They argue these statements "primed the jury to anti-Black prejudices and stereotypes," including the stereotype that "Black defendants [are] more capable of violence and culpable." We do not agree.

We have found no instance in the trial record in which the prosecutor used defendants' gang names in a mocking manner or with racial animus. In context, the prosecutor's reference to "normal people" was to people who are not involved in the gang lifestyle; it was not to disparage defendants or anyone based on race. The prosecutor's references to "normal people" not believing that the *Perkins* statements could be true, and to defendants going "hunting" for a NAW gang member, were fair comments on the evidence. In opening and closing argument, the prosecution "is given wide latitude to make ' "fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 72.) Thus, defendants have

108

not established an RJA violation based on the prosecutor's use of defendants' gang names or the prosecutor's closing argument.

*The Rap Music Videos and Lyrics*: Defendants claim that the prosecutor's use of the *Warning* and *Beefin'* rap music videos and lyrics "exhibited racial bias" against them because "the prosecutor presented the videos and lyrics as literal truth of the defendants' way of life and culture, and as part of the evidence she would rely on to argue that they were not 'normal people,' and 'they have very little, if any, respect for human life." This claim is also not supported by the trial record.

First, the prosecutor did not mention the rap videos or lyrics when she told the jury she understood that "normal people" like the jurors would find it difficult to believe Ford's and Wright-Patterson's *Perkins* statements. Second, the prosecutor did not use the rap music videos or lyrics to show defendants' "way of life and culture," or to trigger racial bias against defendants. Rather, the prosecutor used the rap music videos and lyrics to show that Ford and Wright-Patterson associated with other 4CHC gang members, that 4CHC gang members shared firearms, and that 4CHC gang members were willing to retaliate against the gang's enemies with firearms. Thus, defendants have not established an RJA violation based on the prosecutor's use of the rap music videos and lyrics.

4. <u>No Ineffective Assistance of Counsel Is Shown</u>

Defendants claim their counsel rendered ineffective assistance of counsel "by failing to file a motion for relief or raise objections to evidence pursuant to the [RJA]." "Reviewing courts will reverse convictions on the ground of inadequate counsel only if

109

the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.  In all other cases the conviction will be affirmed and the defendant relegated to habeas corpus proceedings at which evidence [outside] the record may be taken to determine the basis, if any, for counsel's conduct or omission."  (*People v. Fosselman* (1983) 33 Cal.3d 572, 581-582; *People v. Mendoza-Tello* (1997) 15 Cal.4th 264, 266-267.)

Here, the record on appeal shows counsel had a rational tactical purpose for not pursuing their RJA claims in the trial court or raising objections to evidence pursuant to the RJA.  Counsel could have made the reasonable tactical decision not to object to the prosecutor's uses of the n-word, slang words, "normal people" and "hunting."  Counsel could have concluded such objections would have been futile because, as discussed (1) in using the n-word and slang words, the prosecutor was "relating language used by another," (principally by the defendants themselves), that was "relevant to the case" (§ 745, subd. (a)(2)), and, in referring to "normal" people and "hunting," the prosecutor was fairly commenting on the evidence.  (*People v. Parker*, *supra*, 13 Cal.5th at p. 72; see *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions."].)  Further, a reasonable tactical decision could have been made to respond to the prosecutor's argument in counsel's own argument, rather than interrupt the prosecutor's argument.  (See *People v. Welch* (1999) 20 Cal.4th 701, 764.)

L. *The Matter Must Be Remanded for "Full" Resentencing*

Defendants claim the matter must be remanded for resentencing, and the sentencing minute orders and abstracts of judgment must be corrected based on several sentencing errors. The People agree resentencing is required, but not for all of the reasons defendants claim. We conclude the matter must be remanded for "full resentencing," notwithstanding any errors in defendants' original sentences, given our reversal of true findings on the gang enhancement and gang-murder special circumstance allegations. Nonetheless, we address defendants' claims of sentencing error for the court's guidance on remand.

    1. The Matter Must Be Remanded for Full Resentencing

As we explained in Sections III.E. and III.F., the matter must be remanded to allow the People the opportunity to retry defendants on the gang enhancement and gang-murder special circumstances allegations in count one. (§§ 186.22, subd. (b), 190.2, subd. (a)(22).) Our reversal of the true findings on these allegations means (1) defendants' LWOP sentences must be stricken, and (2) defendants must be resentenced on all counts and enhancements, regardless of whether the gang enhancement and gang-murder special circumstance allegations are retried, or the results of any retrial.

"[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) "[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant." (*People v. Valenzuela* (2019)

111

7 Cal.5th 415, 424-425.)  These may include the selection of a principle term, whether to stay a sentence, whether to impose an upper, middle, or lower term, and whether to impose concurrent or consecutive sentences.  (*People v. Jones* (2022) 79 Cal.App.5th 37, 46.)  The court may also consider "any pertinent circumstances which have arisen since the prior sentence was imposed."  (*Buycks*, at p. 893.)  Full resentencing is appropriate here, given the " 'inherently integrated nature' " of felony resentencing for a multiple-count conviction.  (*Jones*, at p. 46; *People v. Choi* (2021) 59 Cal.App.5th 753, 769-770 [full resentencing appropriate after prison prior enhancements were stricken].)

      2.  <u>Defendants' Claims of Original Sentencing Error</u>

      (a)  *The Verdicts and Sentences*

In December 2021, the jury found Stewart, Ford, and Wright-Patterson guilty of first degree murder in count one and of being felons in possession of firearms at the time of the murder in counts two, three, and four, respectively.  The jury also found the gang enhancement and gang-murder special circumstances allegations true on count one, and found a personal discharge enhancement allegation true as to Ford but not true as to Stewart and Wright-Patterson.  Stewart admitted a prior serious felony conviction and a prior strike conviction.

Ford and Stewart were sentenced on January 21, 2022 and Wright-Patterson was sentenced on February 25, 2022.  The sentencing minute orders and abstracts of judgment show defendants were sentenced to LWOP for the murder, plus determinate terms of 15 years for the gang enhancements on their murder convictions.  Stewart was sentenced to a consecutive term six years on count 2 (the three-year upper term, doubled based on the

112

prior strike), plus five years for the prior serious felony enhancement. Ford was sentenced to a consecutive, indeterminate term of 25 years to life on the firearm enhancement on Ford's murder conviction one, and Ford and Wright-Patterson were sentenced to consecutive, upper terms of three years on counts 3 and 4, respectively.

(b) *Senate Bill 567 and the Upper Terms on Counts 2, 3, and 4*

The parties agree that the upper, three-year base terms on counts two, three, and four are unauthorized and must be stricken in light of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567). Effective January 1, 2022, "Senate Bill 567 amended section 1170, subdivision (b) to specify that, when a sentencing court chooses a term from a statutory triad, the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation to them, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction. (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding Pen. Code, § 1170, subd. (b)(1)-(3).)" (*People v. Jones*, *supra*, 79 Cal.App.5th at p. 44.)

Senate Bill 567 applies retroactively to nonfinal judgments, that is, to cases on direct appeal on its January 1, 2022 effective date. (*People v. Bingham* (2023) 95 Cal.App.5th 1072, 1083.) But here, Senate Bill 567 was in effect at the time defendants were sentenced in 2022. The People concede that the upper terms were unauthorized because no circumstances in aggravation were stipulated to by defendants or found true beyond a reasonable doubt by the trier of fact. (§ 1170, subd. (b)(1), (2).) We agree that the upper terms are unauthorized. But the error is inconsequential because

113

defendants must be fully resentenced based on our reversal of the gang enhancements and the gang-murder special circumstance findings on defendants' murder convictions. (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1445 ["A case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief."].)  At resentencing, the court may revisit all issues pertinent to imposing sentence on counts two, three, and four, including whether to impose the upper, middle or lower terms, run the terms consecutive to count one, or stay imposition of the terms.  (*People v. Jones*, *supra*, 79 Cal.App.5th at p. 44.)

(c)  *Defendants' Other Claims of Sentencing Error*

Defendants claims the 15-year determinate terms on the gang enhancements are unauthorized.  We agree.  The authorized sentence for a gang enhancement on a first degree murder conviction punishable by 25 years to life is a 15-year minimum parole eligibility period, not a 15-year determinate term, and the parole eligibility period does not apply to LWOP sentences.  (§ 186.22, subd. (b)(5); *People v. Lopez* (2005) 34 Cal.4th 1002, 1004-1011.)  At resentencing, whether a 15-year minimum parole eligibility period will apply will depend upon whether the gang-murder special circumstance allegations have been retried and found true.  If so, defendants must be resentenced to LWOP on their murder convictions; if not, they must be sentenced to 25-year-to-life terms with 15-year minimum parole eligibility periods.

Lastly, Stewart and Ford claim that their judgments of conviction, sentencing minute orders, and abstracts of judgment must be corrected to conform to the court's *oral pronouncements* of their judgments.  Together, they claim Stewart's six-year sentence on

114

count 2, Stewart's five year sentence on his prior serious felony conviction, and Ford's

25-year-to-life sentence on his firearm enhancement must be stricken because the court

did not orally pronounce these sentences.[17]

As Stewart and Ford point out, and the People agree, the court had a "mandatory

duty to pronounce judgment" on each conviction and enhancement. (*Hoffman v.

Superior Court* (1981) 122 Cal.App.3d 715, 724.) "After a conviction, following either a

plea or verdict of guilty, the court must pronounce judgment upon the defendant (Pen.

Code, §§ 1191, 1193, 1202, 1445), i.e., impose a fine or sentence of

imprisonment. [Citation.] Pronouncement of judgment must be done orally." (*People v.

Blackman* (1963) 223 Cal.App.2d 303, 307; *In re Sandel* (1966) 64 Cal.2d 412 415.) If

there is a discrepancy between the oral pronouncement of judgment and the minutes or

abstract of judgment, the oral pronouncement controls. (*People v. Zackery* (2007) 147

Cal.App.4th 380, 385; *People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.)[18]

---

[17] In orally pronouncing Stewart's sentence, the court did not mention the six-year term on Stewart's conviction in count 2 or the five-year term on Stewart's prior serious felony conviction, although these terms are reflected in the Stewart's sentencing minute order and abstract of judgment. In orally pronouncing Ford's sentence, the court said: "Count 3 is the principal term, that's three years, but its' not really relevant. Count 1 is the indeterminate term. That's 25 years to life. The use of a firearm is 25 years to life. But because of the special circumstances . . . the *only sentence that this court is going to impose at this time is* [*LWOP*]." Ford's sentencing minute orders and abstracts of judgment show, however, that the court imposed 25 years to life on Ford's firearm enhancement in count one.

[18] " 'Rendition of judgment is an oral pronouncement.' Entering the judgment in the minutes being a clerical function (Pen. Code, § 1207), a discrepancy between the judgment as orally pronounced and as entered in the minutes is presumably the result of clerical error. Nor is the abstract of judgment controlling. 'The abstract of judgment is

*[footnote continued on next page]*

115

If the record is silent on why the court did not orally pronounce sentence on a conviction, " 'in the absence of evidence to the contrary, it may be inferred that the omission was an act of leniency by the trial court.  In such circumstances the silence operates as a finding that the . . . conviction was not true.' " (*People . Mesa*, *supra*, 14 Cal.3d at p. 471.)  Here, however, "the record is not 'silent' as the oral pronouncement 'speaks' to impliedly affirm" that the trial court intended to impose the sentences reflected in the minute orders and abstracts of judgment.  (*People v. Chambers* (2002) 104 Cal.App.4th 1047, 1050.)  The court made clear its intent to impose the maximum possible sentence on each defendant.  In sentencing Ford and Stewart, the court said, "I'm making a finding that all three of you planned this, all three of you went there.  And Mr. Ford, you shot in a house, knowing that people were in there.  The victim, Curtis McDaniel, all he was doing was sitting there watching television and eating.  You destroyed . . . [an] entire family."  In context, the court's silence on some aspects of Stewart's and Ford's sentences reflects the court's belief that those aspects of the sentences were unimportant in light of defendants' LWOP sentences, but the court's silence does not indicate that the court did not intend to impose the sentences reflected in the sentencing minute orders and abstracts of judgment, or in any way suggest that the convictions were erroneous or not true.  In any event, our reversal of the true findings on the gang enhancements and gang-murder special circumstance allegations means

---

not the judgment of conviction. By its very nature, definition and terms [citation] it cannot add to or modify the judgment which it purports to digest or summarize.' " (*People v. Mesa* (1975) 14 Cal.3d 466, 471.)

defendants must be fully resentenced, notwithstanding the errors in their original sentences. Thus, we remand the matter for full resentencing.

## IV. DISPOSITION

The true findings on the gang enhancement allegations (§ 186.22, subd. (b)), and the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)) are reversed. The matter is remanded to the superior court with directions to allow the People to retry these allegations if they choose to do so, and to conduct a full resentencing, regardless of whether the allegations are retried or the results of any retrial. At resentencing, the court is directed to orally pronounce sentence on each conviction and enhancement in accordance with all applicable laws then in effect. The judgments are affirmed in all other respects.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS

J.

We concur:


McKINSTER

Acting P. J.


CODRINGTON

J.

117